## Levi Windmuller v. Johanna Fleming, Executrix, et al.

### Gen. No. 12,595.

1. SALE—*distinction between executed and executory.* An executory sale differs from an executed one in that the former passes no immediate title, even in the case of a distinct and specified chattel.

2. SALE—*how question as to whether, was intended, determined.* Whether an actual executed sale was intended by the parties to an agreement is to be determined initially from the language of such agreement, but in the event of ambiguity the intention of the parties may be ascertained from extraneous circumstances taken in connection with such agreement.

3. CHANCELLOR—*when findings of fact by, not disturbed.* Findings of fact of the chancellor will not be disturbed unless clearly and palpably against the weight of the evidence.

Bill for accounting. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the October term, 1905. Affirmed in part, reversed in part and remanded with directions. Opinion filed November 15, 1906.

**Statement by the Court.** June 20, 1901, Levi Windmuller, the appellant, filed a bill for an accounting in respect to the earnings of certain vessels in which he claimed an interest, in the Superior Court of Cook county, making defendants thereto P. H. Fleming, O. G. Orr and E. J. Fleming, partners under the name of P. H. Fleming and Co. P. H. Fleming died November 20, 1901, pending the suit, and Johanna Fleming, his executrix, was substituted as defendant. The following insurance companies were also made parties to the bill: U. S. Lloyds, Union Marine, Mannheim, Lloyds London, Western Assurance of Toronto and British American Assurance of Toronto. Issues were made up by answers and replications. We think it unnecesary to state the pleadings, as no question is made as to their sufficiency, or as to any variance. The Pittsburg & Western Railway and the Baltimore & Ohio R'd had a contract with

the Owen line of steamers, a corporation, for the purpose of establishing and maintaining, by lake and rail, a through route, by way of Fairport, Ohio, between Lake Michigan ports to the Atlantic seaboard and intermediate points, for the transporation of freight. At the time of the execution of this contract the Owen line had only two boats, the steamers Ira H. Owen and the Parke Foster. P. H. Fleming was the general manager of the Owen line.

April 6, 1898, the receivers of the aforementioned railroad companies entered into an agreement in writing with P. H. Fleming & Co., whereby, after reciting that the two steamers of the Owen line were incapable of rendering sufficient service, and that it was necessary to have additional vessels in order to establish regular sailing and efficient handling of the business, P. H. Fleming & Co. agreed to place an additional steamer on the route between Lake Michigan ports and Fairport and *vice versa,* to be engaged in the service of said railroad companies under the same terms and conditions as mentioned in the Owen line contract with said companies, and also, by the said agreements of April 6th, P. H. Fleming & Co. were authorized by the receivers of said companies, at their option, to employ other additional steamers in said business, "the intent of P. H. Fleming & Co. being to furnish all steamers necessary for the proper performance of such business, in addition to the Owen line."

The Owen line, by its contract with the railroad companies, was only required to furnish the two steamers owned by it. Fleming & Co., in pursuance of their contract with the railroad companies, furnished a number of steamers, additional to the two furnished by the Owen line, among them the Escanaba, subsequently, when purchased by Fleming & Co., named the Baltimore, and the M. H. Boyce. The complainant, Windmuller, claims that he owned a fourth interest

in the Baltimore, and a half interest in the Boyce, and asks an accounting of the earnings of those two steamers. The defendants contend that complainant had no interest in the Baltimore, and only a third interest in the Boyce. The Baltimore was lost at sea May 24, 1901, at which date she was insured by the insurance companies which are made defendants. The cause was heard by the chancellor on the pleadings and proofs produced in open court, and the court, September 1, 1903, rendered an interlocutory decree finding, substantially, as follows:

"1. The Owen line, the owner of the vessels Ira H. Owen and Parke Foster, contracted with the receivers of the railroad companies above mentioned, in pursuance of the contract above mentioned, a copy of which is annexed to the bill and marked 'Exhibit A.'

2. P. H. Fleming & Co. arranged with the receivers of the B. & O. R'd Co. to carry the excess freight, which the Owen line could not carry, and, during the year 1897, said Fleming & Co. provided the steamers Dyer, Boyce, Escanaba and Tower, carrying, during said season, about 10,000 tons of freight, the average capacity of said vessels being 1,500 tons. Complainant was not, during the year 1897, and never has been, a member of the firm of P. H. Fleming & Co., and was not a party to the arrangement, or agreement, of said firm with the receivers of the B. & O. R'd Co. to carry the surplus freight, and had no interest in the chartering by said firm of the steamers Dyer, Boyce, Escanaba and Tower, and, during 1897, had no interest in any enterprise in which said firm was engaged, and is not entitled to any accounting from said defendants, concerning the transactions of said firm, or the chartering of said vessels, during the year 1897.

3. P. H. Fleming & Co., January 18, 1899, at a public sale of the Escanaba, by the U. S. Marshal for the Northern District of Illinois, bid in said steamer for the sum of $12,000, and, February 16, 1899, received a bill of sale of said vessel from said Marshal,

which was recorded March 4, 1899, etc.   February 11, 1899, P. H. Fleming & Co. agreed with complainant to sell to him a one-fourth interest in the Escanaba, on payment by complainant, in cash, within thirty days from February 11, 1899, one-fourth of the actual cost of said steamer, and one-fourth the expense of ship-keeping, insurance and repairs, which last were being made.   Said firm was ready and willing at all times during said thirty days to carry out said agreement; but complainant did not carry out his part of said agreement within said thirty days, or subsequent thereto, but therein made default, and, about March 14 or 15, 1899, stated to C. G Orr and E. J. Fleming, members of the firm of E. J. Fleming & Co., that he was unable to raise the cash payment required by said contract, and thereupon said contract was, by mutual consent, abandoned; and complainant never thereafter claimed to said firm. or to any member thereof, that he had one-fourth or any interest in said steamer, until after her loss May 24, 1901, at which time she was insured in the sum of $30,000.   Complainant had not, at any time, any interest in the steamer Escanaba or Baltimore, which entitles him to an accounting from defendants.

4.   The firm of P. H. Fleming & Co. entered into the agreement, complainant's 'Exhibit 3,' dated April 27, 1899, with W. F. McGregor, managing owner of the steamer M. H. Boyce, and said firm entered on the performance of the same May 10, 1898, when said steamer was delivered to them by her owners, at Chicago, Illinois, and, thereupon, said firm loaded said steamer with a cargo and engaged her in the business of commerce and navigation."

The agreement of April 27, 1898, referred to by the court as "Exhibit 3" purports to be between W. F. McGregor, managing owner of the steamer M. H. Boyce, of the first part, and P. H. Fleming & Co., L. Windmuller and W. R. Owen, of the second part, and charters that steamer, her engines, etc., to the parties

of the second part for a term to commence May
10, 1898, and to terminate December 12, 1898, at
noon, at a Lake Michigan port. The parties of the
second part agree to pay for said term $7,000 in in-
stallments. The signatures to the contract are W. F.
McGregor, P. H. Fleming & Co., and L. Windmuller.
The court proceeds with its findings thus, in sub-
stance:

P. H. Fleming & Co. paid the owners of said steamer
$680.40 June 1st, and $500 June 15th, charter money
due on said dates respectively. June 23, 1898, the con-
tract, type-written, with the names L. Windmuller and
W. R. Owen interlined in ink, after the word "Co.,"
was mailed by P. H. Fleming & Co. to Levi Windmul-
ler, with a letter of said date stating what of the earn-
ings, to the extent of one-third, he would be entitled
to, and what of the expenses. to the extent of one-
third, he was to bear, and that he was to bear one-third
of the charter money, and requesting his signature to
the contract. Complainant agreed to the conditions
named in the letter, and June 24, 1898, signed the char-
ter contract, which had been signed by McGregor and
P. H. Fleming & Co. before it was submitted to him.
The ordering part of the decree is as follows:

"It is therefore ordered, adjudged and decreed that
this cause be referred to Hiram Barber, one of the mas-
ters in chancery of this court, to take an account of
the earnings and expenses of the steamer 'M. H. Boyce'
from the 10th day of May, 1898, until the 12th day of
December, 1898, as fixed in defendant's 'Exhibit E'
being the letter of June 23 1898, from P. H. Fleming
& Company to L. Windmuller, the complainant. That
is to say, the earnings for which they are to account
are for the amount received by them for freight car-
ried by said steamer during said season of 1898, as
shown by the bills of lading or manifests, contracts,
correspondence with reference to the freights carried
by said vessel during the season of 1898, except the
letter of April 15, 1898, of P. H. Fleming & Company,
less any claims paid for shortages or breakages that

were rendered against said steamer, and less any rebates or overcharges which the receivers of the Baltimore & Ohio Railroad Company were allowed by the firm of P. H. Fleming & Company, or which said firm paid for the purpose of procuring freight.

There is to be allowed to the said firm of P. H. Fleming & Company all sums paid out by them to the owners of said steamer 'Boyce' as charter money, and all brokerage charges in the chartering by the said firm of P. H. Fleming & Company of said steamer, at the rate of $15 for each charter or trip, and also the amounts paid by them to other brokers or the agent at Fairport for similar service, not to exceed $15 per trip, and there shall be allowed to the said firm of P. H. Fleming & Company also the sum of $500 for their services as a firm in soliciting and obtaining package freight for the said steamer, and transacting her business during said season of navigation

There is also to be allowed to said firm of P. H. Fleming & Co., a *pro rata* share, based on the amount of tonnage carried by the steamer 'M. H. Boyce,' as compared with the tonnage carried by the Owen Line of steamers, of the necessary expenses of office help, solicitors to get freight, clerks, river men, tally men, etc., in conducting the business of the said Owen line of steamers and the said steamer 'Boyce' by the said firm of P. H. Fleming & Co.

The master will also allow in the said accounting to the said firm of P. H. Fleming & Company, any and all expenses and charges that were proper and necessary in the conduct and management of the said steamer 'M. H. Boyce' during said season of navigation, and in the settling of all claims and demands growing out of the operation and earnings of said steamer 'M. H. Boyce,' as specified in said letter of June 23, 1898.

The master will allow to the said complainant upon said accounting, one-third of the net profits thereof, if any, and to the firm of P. H. Fleming & Company two-thirds of the net profits thereof, if any, and charge to said complainant, with one-third of the net loss,

if any, and to the said firm of P. H. Fleming & Company, two-thirds of the net loss, if any.

And it is ordered that what shall appear to be due from said complainant to the surviving members of the firm of P. H. Fleming & Company, or from said surviving members of said firm to said complainant, on the balance of the said account, be paid by such party from whom such balance shall be found due to the other, within thirty days after the report of the said master shall have been approved and confirmed by this court.

And it is further ordered that the said master make his report herein with all convenient speed; and that the said master, or either of said parties, be at liberty to apply to the court for further directions, and that the court reserves the consideration of costs until after the said master shall have made his report."

July 6, 1905, the master filed his report, finding that the complainant was entitled to recover from the defendants Orr and E. J. Fleming, surviving members of the copartnership of P. H. Fleming & Co., $3,210.58, on account of the earnings of the steamer M. H. Boyce. July 20, 1905, the court rendered a final decree, overruling all exceptions to the master's report, confirming the report, and decreeing that, within thirty days, the defendants, or some of them, should pay to the complainant $3,260.53, and that the costs should be apportioned one-third to be paid by complainant, and two-thirds by the defendants.

Kremer & Greenfield, for appellant; F. S. Mastin, of counsel.

Richberg & Richberg, for appellees.

Mr. Justice Adams delivered the opinion of the court.

Appellant's counsel contend that the court erred in finding that the complainant had no interest in the steamer Escanaba, or in her earnings, and also erred in finding that complainant had only a one-third in-

terest in the steamer M. H. Boyce. The agreement between P. H. Fleming & Co. and complainant is evidenced by the following instrument:

"CHICAGO, Ill., Feb. 11, 1899.

This agreement made this 11th day of February, 1899, by and between P. H Fleming & Company, party of the first part, and Levi Windmuller, party of the second part.

Witnesseth: That said party of the first part, for the consideration hereinafter mentioned, covenants and agrees with said party of the second part to sell him a quarter interest in the hull and machinery of the steamer 'Escanaba.'

In consideration of which the said party of the second part covenants and agrees with the said party of the first part, to pay in cash for the said quarter interest in the above named steamer, within thirty days from the date hereof, at the actual cost thereof, and the expenses of shipkeeping, insurance, and all and any repairs, etc.

In witness whereof, the parties of these presents have hereunto set their hands the date and year above written.

P. H. FLEMING & Co."

The court held, as shown by the preceding statement, that the agreement between Fleming & Co. in respect to the Escanaba was abandoned by mutual consent. The evidence for the defendants is that prior to the expiration of the thirty days mentioned in the instrument, and after the expiration of said time, complainant was requested by a member of the firm of P. H. Fleming & Co. to make payment of the money mentioned in the instrument; that on the first occasion he said he was trying to raise it, but had been delayed by the absence of his attorney; but that he expected to have money to pay it at the expiration of the contract; and that on the last occasion he said he was unable to pay, as he had been compelled to use the money, when Mr. Orr, of Fleming & Co., who made the demand

on him, said, "Then that settles your interest in the Baltimore," and appellant said, "Well, I can't help it."

The name of the Escanaba was changed to the Baltimore soon after she came into the possession of Fleming & Co.

The evidence is that complainant never made any payment on the contract, and the evidence for defendants is, that he never asked for an account of the earnings of the vessel, although she was engaged in the same business as the Boyce and other vessels chartered by P. H. Fleming & Co., after she was repaired and until after May 24, 1901, at which date she was totally lost. The appellant, who was in the ship supplying business, and supplied the vessels operated by Fleming & Co. in the years 1899, 1900, and 1901, must have known of the trips of the Baltimore. His first inquiry about her was by a telegram to Mr. Orr two days after her loss, and was, whether she was insured, so that complainant, who now claims to have had a one-fourth interest in her by virtue of the agreement between him and P. H. Fleming & Co., manifested so little interest in her that from February 11, 1899, until after May 24, 1901, he had not inquired, and did not know whether she was insured. Complainant testified that he had three or four talks with Mr. Orr about a settlement of their affairs, and for an accounting in respect to the Baltimore, in 1897 and 1901, but Mr. Orr denies this; and P. H. Fleming, of P. H. Fleming & Co., and bookkeeper for the firm, testified that appellant, up to the date of filing the bill, had never asked him for such accounting; and William Matt, who was assistant bookkeeper for P. H. Fleming & Co. testified that during the year 1897, when witness became assistant bookkeeper, complainant did not, nor did he at any subsequent time, ask him for an account of the earnings of the Baltimore, and that he was never instructed to give him such information.

Complainant testified that while the contract was before him for his signature, he had a conversation with Mr. Orr in regard to an application of money in the hands of P. H. Fleming & Co., upon the payment of his interest in the Escanaba. This evidence was excluded, but it is significant that he did not sign the contract at all. The testimony of Orr and E. J. Fleming that when payment was demanded of complainant, after the expiration of the time limited for payment by the contract, he said he was unable to pay, when Mr. Orr said, "Then that settles your interest in the Escanaba," and appellant said, "Well, I can't help it." This evidence is wholly inconsistent with complainant's claim that he had money in the hands of P. H. Fleming & Co. sufficient to make payment as required by his contract, and that he sought to have it so applied. The contention that complainant requested P. H. Fleming & Co. to apply money of his which he claims was in their hands, is not averred in complainant's bill, and seems to have been an afterthought.

Counsel for complainant contended that there was an actual sale to him of a fourth interest in the Escanaba, which vested in him the title to said one-fourth interest, and that no mere abandonment by him would divest his title. There is a clear and well-recognized distinction between a sale and an agreement for a sale, which latter is merely executory and passes no immediate title, even in the case of a distinct and specified chattel. Benjamin on Sales, 6 Am. Ed., sec. 308 *et sequens*. The agreement of February 11, 1889, does not necessarily imply a future sale. The words "agree to sell," taken in their ordinary acceptation, refer to the future. But the question whether there was an actual sale vesting title in complainant cannot always be determined from the language of the agreement, but may depend on the intention of the parties and other circumstances. In Martin v. Adams, 104 Mass. 262, the

words used were "agrees to sell," and "agrees to purchase * * * and to pay," etc. The property, when the agreement was executed, was in the possession of the purchaser, and nothing remained to be done by the vendor, and the court held there was an actual sale passing the title. See, also, Brock v. O'Donnell, 45 N. J. L. 441. The language of the agreement being susceptible of interpretation as an agreement for a future sale, and it being, therefore, doubtful whether the agreement is one for a future sale, or evidence of an actual sale, must be determined by the intention of the parties. Benj. on Sales, sec. 309; Graff v. Fitch, 58 Ill. 373; Shelton v. Franklin, 68 ib., 333-338; Straus v. Meinzesheimer, 78 ib. 492-499. The cases cited also hold that, notwithstanding some act remains to be done, such as weighing or measuring, the sale may be complete if such appears to have been the intention of the parties. In Shelton v. Franklin, *supra*, p. 368, the court say: "So, although something remains to be done for the purpose of vesting the property, or to fix the amount to be paid by weighing, measuring, or the like, the property will pass before the act is done, if such appears by the contract to have been the intention of the parties," citing numerous cases.

Complainant's agreement was "to pay in cash for the said quarter interest in the above named steamer, within thirty days from the date hereof, at the actual cost thereof, and the expenses of shipkeeping, insurance, and all and any repairs," etc. The vessel was sold to P. H. Fleming & Co. by the United States Marshal for $12,000, the one-fourth of which was readily ascertainable, but the work of repairing was commenced February 10, 1899, and finished May 1, 1899. The work was being done by the day, and there was no contract for any fixed sum as the price of it, so that the price of the repairing, and complainant's proportion thereof, could not be ascertained until the completion of the work. This, however, does not, in view of

the authorities cited, *supra*, militate against the view that the agreement may have been intended as an actual present sale. The question to be determined is, whether the parties understood and intended the agreement of April 11, 1899, as an actual sale at that date, or whether they understood and intended it as an agreement for a future sale, which latter we think consistent with its terms. The complainant, in his bill, avers that there was a sale, and it is incumbent on him to so prove. This question is to be determined by the acts, declarations and conduct of the parties in relation to the subject-matter, as shown by the evidence. We have already referred to part of the evidence bearing on the question of intention; but counsel for complainant rely mainly on certain evidence which we will now refer to.

The complainant testified that, on the day the contract between him and Fleming & Co. was signed, it was said that the repairs were to be made by Bates and looked after by him, and that, after the repairs were commenced, he, complainant, went to the boat two or three times a week up to May 1st, to look after the work and consult with Mr. Place, and that he went to Orr's office four or five times a week to talk over the repairs with him, until about the last of April. Who Mr. Place was and his employment will appear later. W. H. Sproul testified that after the marshal's sale complainant sent for him and wanted him to act as shipkeeper of the vessel, and introduced him to Mr. Orr, who asked complainant what arrangement he had made with witness about wages, and complainant said everything was satisfactory, and that Orr sent a man out with him, witness, to get the keys from the shipkeeper then on the boat, and that witness was shipkeeper for three or four months; that he painted the vessel and got an order from complainant for the paint, when witness asked Mr. Orr about it and he said, "All right, go ahead and get it;" that Place was

captain of the vessel while the repairs were being made, and complainant was aboard the vessel once or twice a week while the repairs were going on, and witness heard Place talk to him about what should be done, and heard complainant tell Place to go ahead and do it. On cross-examination the witness said that he became a shipkeeper a day or two after the sale by the marshal, which occurred January 16, 1899, before the execution of the April 11, 1899, agreement.

J. B. Bates, of J. B. Bates & Co., who made the repairs, testified that Captain Place negotiated for the repairs; that complainant was at the vessel quite often, and he saw him going around the work and talking to Captain Place about it; that he saw him there ten or twenty times. On cross-examination this witness said that he only knew complainant as being engaged in the meat and grocery business and vessel owner, and not at all as a superintendent of vessel repairs, and that he could not swear positively that he saw him on board the vessel in March or April.

J. B. Bates, Jr., son of the last mentioned witness, and interested with him in the ship repairing business, testified that the last continuous work was done March 27th, and only an occasional day was put in after that date; that the work up to March 27th was done on the order of Captain Place, and the work after that date, by order of Captain Merritt, who succeeded Place, and that all the work was paid for by P. H. Fleming & Co.; that he saw complainant at the vessel at least half a dozen times, and had seen him and Captain Place talking together and pointing to places about the deck at points where they afterward took up the deck.

Walter Scott and Eric Simpson testified that they saw complainant and Captain Place aboard the vessel talking about the work. It will be observed that none of the witnesses testifies to anything said in any conversation between complainant and Captain Place, or

to any specific thing which complainant directed Place to do. The evidence shows that Captain Place was employed by P. H. Fleming & Co. to superintend the repairs, and that they paid him for his services as such superintendent.

The intention must have been mutual to avail complainant, and we think it clear that Fleming & Co. did not intend a sale, except on compliance by complainant with his part of the agreement, and complainant's language, when demand was made on him by Orr, seems to indicate that such was his understanding.

The question whether the parties intended a complete sale, by the agreement of April 11, 1899, is a question of fact. The question of intent is, in a case at law, determinable by the jury. Shelton v. Franklin, 68 Ill. 333-338, citing McClung v. Kelley, 21 Ia. 508; DeRidder v. Knight, 13 Johnson, 203; Riddle v. Varnum, 20 Pick. 283, and George v. Stubbs, 26 Maine, 243.

These cases fully support the text of the opinion. In equity, the question is for the chancellor to decide on the evidence. The evidence as to intent is the testimony of witnesses given in open court, and is conflicting. In such case, the rule in this state is, that the finding of the chancellor will not be disturbed unless it is clearly and palpably contrary to the weight of the evidence. Delaney v. Delaney, 175 Ill. 187-199; Columbia Theatre Am. Co. v. Adsit, 211 ib. 122, 125.

We cannot say that the finding is clearly against the weight of the evidence.

We will next consider whether or not the court erred in finding that complainant's interest in the steamer Boyce was a one-third interest, and not a one-half interest, as complainant claims. The agreement, by which vessels additional to the two vessels owned by the Owen line were chartered, was solely between the receivers of the railroad companies and P. H. Fleming & Co. Complainant had nothing to do

with that contract. The charter party of the Boyce, as drafted and signed by W. F. McGregor, the managing owner of the vessel, was in typewriting, and ran from McGregor to P. H. Fleming & Co., and was sent by McGregor to them. It was dated April 27, 1898. It being apparently contemplated that complainant and W. R. Owen would each take a one-third interest in the charter party, their names were interlined therein, in writing, after the name P. H. Fleming & Co., and P. H. Fleming enclosed the charter party to complainant, with the names of Owen and complainant interlined therein in writing, in a letter of date June 23, 1898, which contains the following:

"Enclosed we hand you contract, steamer Mary H. Boyce. We have examined same. It is apparently in order. Wish you to execute it, and, after your execution, we will send it to Mr. W. R. Owen for his execution. We pay the sum of $7,000 from May 10th to December 12th for this vessel, and we also pay her current expenses, except marine insurance  We have engaged the boat for general trade, mostly in connection with the Baltimore & Ohio to Fairport, and for similar service as that of the Owen line steamers. We expect to pay charter party and handle her expenses and freight. At the termination of the season it is our intention to sum the matter up, and if there is any profit accruing after performing this, you are to receive one-third of the same, P. H. Fleming & Co. one-third, and W. R. Owen one-third. On the other hand, if there is any loss, or we are out on the proposition, we expect you to pay one-third of the same, P. H. Fleming & Co. one-third, and W. R. Owen one-third."

Complainant signed the charter party, on which his name was interlined as a party, but W. R. Owen refused to sign it, on the ground that, in his opinion, the vessel would not be profitable. Owen testified that Fleming & Co. chartered the extra vessels, but he did not dictate or advise the chartering of them, and had no interest in them. The fact that he refused to sign the charter party when presented to him is evidence

that Mr. McGregor, when he signed the charter party, did not know that it was contemplated that Owen would be a party to it, as otherwise his name would have been in typewriting, like the other parts of the document. The same may be said with regard to complainant. We have thus a charter party, when signed by McGregor running solely to P. H Fleming & Co., subsequently changed, by the insertion therein of the names of complainant and W. R. Owen. There is no evidence that McGregor, the first party to the charter party, assented to or knew of this. He looked to P. H. Fleming & Co., to whom the charter party ran, when he signed it. Complainant, by signing the charter party, agreed to the terms of the letter of June 28, 1898, including the statement that he was to have one-third interest in the profits of the Boyce. He signed the charter party, without protest or objection to the terms stated in the letter, thereby tacitly assenting to such terms. That letter and his assent to its terms is also evidence that, if there was any prior oral agreement or understanding between him and P. H. Fleming & Co., it was that he was to have a one-third interest in the Boyce, as otherwise he would have objected to the letter. The Boyce, by the charter party, was to be delivered to P. H. Fleming & Co. May 10, 1898, and Mr. Orr testified that on that day she came into the possession of P. H. Fleming & Co., and that she sailed from Chicago May 11, 1898, under the management of P. H. Fleming & Co. Therefore, June 23, 1898, P. H. Fleming & Co. were the charterers of the vessel, had possession of her, and were in a position to determine whether they would part with any interest in her, and, if so, what interest and to whom. They decided to part with one-third interest to complainant, and wrote him to that effect and he accepted their proposition.

Counsel for appellant now claim that, by the refusal of Mr. Owen to sign the charter party, complainant

and P. H. Fleming & Co. each became the owner of
half the one-third interest which it was contemplated
Mr. Owen would take—in other words, that each of
them became entitled to one-half interest; and they
cite authorities to the effect that, in the absence of
any agreement to the contrary, partners share
equally, and this is true of partners in a single enter-
prise. Complainant was not a partner in the firm of
P. H. Fleming & Co., nor did he join with that firm in
procuring the charter party, nor does it appear that,
as between him and Mr. McGregor, he was a party to
the charter party. He signed it after Mr. McGregor
signed, and sent it to P. H. Fleming & Co. without
Mr. McGregor's knowledge or consent, so far as ap-
pears from the evidence. He came into the enterprise
after it had been consummated between Mr. McGregor
and P. H. Fleming & Co., and when the entire interest
in the charter party was in them, and derived his
interest solely from them. The signing the charter
party by complainant, on the suggestion of P. H.
Fleming & Co., was an awkward and irregular way
of designating complainant's interest in the profits
of the vessel, but the sufficiency of this to vest an in-
terest in complainant is not questioned by the defend-
ants' counsel. We find no error in the finding of the
court that complainant had only a one-third interest
in the net profits arising from the earnings of the
steamer Boyce. Complainant's counsel, in their argu-
ment, seem to claim that complainant had an interest
in the vessels other than the Escanaba and the Boyce,
but not strenuously, and direct their argument mainly
to the Escanaba and Boyce. The court held, correctly,
as we think, that complainant had no interest in any
vessel chartered by P. H. Fleming & Co. except the
Boyce.

Counsel for complainant have assigned as error and
argued that the court erred in holding that the com-
plainant had no interest in certain so-called terminals.

The reference is to the interlocutory decree of December 1, 1903, settling the rights of the parties and containing directions to the master. By the decree the master was directed to state an account of the earnings of the steamer Boyce from May 10, 1898, till December 12, 1898; "that is to say, the earnings for which they are to account are for amount received for freight carried by steamer during said season, as shown by bill of lading or manifests, contracts, correspondence, with reference to freight carried by said vessel during said season, except the letter of April 15, 1898, of P. H. Fleming & Co. to receivers of the B. & O. R. R. Co." The objection is to that part of the direction contained in the words "except the letter of April 15, 1898," etc. The Boyce charter party is dated April 27, 1898. It was transmitted to complainant for his signature June 23, 1898. Both P. H. Fleming & Co. and complainant were engaged in business in the city of Chicago, and, presumably, complainant signed the charter party about June 23, 1898, the day it was sent to him for his signature. The following correspondence occurred:

"CHICAGO, April 15, 1898.

JOHN K. COWAN,
OSCAR G. MURRAY,
          Receivers, Baltimore & Ohio R. R.,
                    Baltimore, Md.

    GENTLEMEN: We enclose to you Lake contracts between the B. & O. R. R. and the Owen Line and P. H. Fleming & Co. for execution; also a draft of supplementary letter pertaining to division (similar to your letter last year), which should be addressed by you to us.

    In addition to said contract and said supplementary letters as to divisions, it is understood and agreed, as we undertake at our own expense and risk, the engaging of additional boat, or boats, and the maintenance of increased facilities, and for the purpose of your contributing same, that P. H. Fleming & Company are to be allowed in addition to said divisions,

to render bills monthly for one and one-half cents per hundred pounds on all freight eastbound (except grain) delivered to the B. & O. and P. & W. during the season of 1898, from Lake Michigan ports, at Fairport, O.

And on westbound, the sum of two cents per hundred pounds on all freight received from the said B. & O. and P. W., and destined and consigned to Chicago or Milwaukee, or points beyond.

And in addition to above, said P. H. Fleming & Co. are to be allowed by you and to render bills monthly for one-third of the handling expense charged us by the Fairport Warehouse & Elevator Co.

Yours truly,
P. H. FLEMING & Co."

"THE BALTIMORE & OHIO RAILROAD COMPANY,
Office of Manager Freight Traffic.

C. S. WIGHT,
Manager Freight Traffic.
BALTIMORE, July 5, 1898.

P. H. FLEMING, Esq.,
General Manager, Owen Line,
Chicago, Ill.

DEAR SIR: Referring to your letter of April 15 addressed to Receivers Cowen and Murray, would state that the conditions named therein as to allowances for terminals and terminals expense on traffic interchanged with the Owen Line and P. H. Fleming & Co. are satisfactory to the B. & O. R. R.

Yours truly,
C. S. WIGHT."

The one and a half cents per one hundred pounds on east bound freight, and two cents per one hundred pounds on west bound freight, the parties call terminals. The words, "except the letter of April 15, 1898," etc., above quoted, are, in the connection in which they are used, somewhat obscure; but the master in his report interprets the words as meaning that he was not, in taking the account, to charge the so-called terminals against P. H. Fleming & Co., as part of the earnings of the Boyce, and the court, by overruling all .

exceptions to the master's report and confirming it in its entirety, necessarily approved the master's view. The master, in his report, after stating complainant's objection that the defendants improperly failed to charge themselves with $14,368.67 received by them from the B. &. O. R. R. Co. on account of freight carried, says: "It appears from the testimony that this item was made up of so-called terminals; that $5,715.06 of the amount was for terminals on freight carried by the steamer Boyce, and $8,653.61 on freight carried by the Owen Line. From the decree heretofore entered herein, and the order of reference, it appears that this is a subject-matter not within the consideration of the master, and I have, therefore, disregarded this objection." The question is, whether the terminals received from the B. & O. R. R. Co. on account of freight carried by the Boyce, should be charged against Fleming & Co. as part of the earnings of the vessel, thus increasing complainant's proportion of the profits. Counsel for the defendants contend that complainant is not entitled to share in the amount received as terminals by Fleming & Co., but is bound by the express terms of the letter of June 23, 1898, in which the following occurs: "Credits that this boat will receive will be for freights carried *as per bills of lading or as per manifests,* and less any claims for shortages or breakage which may be rendered against said steamer, any rebates or overcharges which the Baltimore & Ohio may bill us for, or which we may have agreed to pay to such people as we procure freight from." The letter of Fleming & Co. to the receiver of the B. & O. R. R Co., stating the agreement as to the two and one and one-half cents per one hundred pounds was written April 15, 1898, more than two months prior to the time complainant signed the charter party. It is true that the letter of C. S. Wight in answer to the letter of April 15, 1898, stating that the allowance for terminals mentioned in the April 15th

letter was satisfactory, is dated July 5, 1898; but the testimony of Mr. Orr, of Fleming & Co., shows conclusively that the agreement between Fleming & Co. and the B. &. O. R. R. Co. was complete before the letter of June 23, 1898, was written, and even before Fleming & Co. signed the charter party. The arrangement for terminals between Fleming & Co. was a secret one, not disclosed to complainant, and of which it appears from the evidence he had no knowledge until the hearing before the chancellor. The following occurred in the cross-examination of Mr. Orr:

Q. "When you invited Mr. Owen and Mr. Windmuller to enter into the chartering of the Boyce, for the season of 1898, did you disclose to them all the earnings for that boat, all the money that you would make by chartering that boat?"

A. "No."

Q. "What didn't you disclose?"

A. "I did not disclose the special concession that the B. & O. had made to us under the contract."

Q. "Now, just in rough figures, what did that amount to in 1898, regardless of who was entitled to it, what did it amount to?"

A. "About $30,000."

Q. "And you never told them of that concession?"

A. "No, it was none of their business."

It is claimed by Fleming & Co. that they were exclusively entitled to the so-called terminals, by reason of their expense and risk, in chartering the Boyce; but we think it clear that all moneys due under the special and secret agreement evidenced by the letters of April 15 and July 5, 1898, are earnings of the additional vessels, and that the steamer Boyce should be credited with her proportion of the same, and that complainant is equitably entitled to receive from P. H. Fleming & Co. his proper proportion of such moneys as have actually been received by them in pursuance of said secret agreement, and, consequently, we think the court erred in directing the master not to

charge the terminals as earnings in the account of Fleming & Co., and in confirming the master's report, in so far as the master omitted to charge Fleming & Co. with the moneys received by them as terminals. Good faith on the part of P. H. Fleming & Co. required that they should inform complainant of the agreement in respect to terminals, and the letter of June 23, 1898, must be read as if said agreement were disclosed therein.

It appears from the evidence that Fleming & Co. allowed certain rebates or payments to shippers as an inducement to them to ship their freight by the Boyce, and the master, in accordance with the court's direction, deducted the same from the earnings of the steamer. We do not think the complainant is in a position to object to this. He was fully informed by the letter of June 23, 1898, that Fleming & Co. might pay money to shippers of freight. In stating what items are to be deducted from earnings, the reading of that letter is, "less * * * any rebates or overcharges which the Baltimore & Ohio may bill us for, *or which we may have agreed to pay to such people as we procure freight from.*" We think that complainant must be held to have agreed to such payments. Complainant's counsel object to other items in the statement of account by the master, but we find no error therein which would, as we think, warrant a reversal. Defendant's counsel have assigned cross-errors in respect to the master's finding and report, which we have considered, and none of which we can sustain.

The decree will be affirmed, except in so far as it confirms that part of the master's report in which the master omits to charge as earnings the moneys due for freight carried by the steamer M. H. Boyce, under and by virtue of the agreement evidenced by the letters of April 15 and July 5, 1898; and also in so far as the

decree limits the sum of money to be recovered by complainant to $3,260.53; and said parts of said decree will be reversed, and the cause remanded with directions to ascertain the amount of money due to the steamer M. H. Boyce by virtue of the agreement evidenced as aforesaid, and the amount of money actually paid to P. H. Fleming & Company under and by virtue of said agreement, and the amount of the money so paid earned by the steamer M. H. Boyce, and complainant's proportion of said amount, and to decree accordingly.

*Affirmed in part, and reversed in part, and remanded with directions.*