Cochran et al. *v.* Posey, Appellant.

Argued November 11, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*B. M. Zimmerman,* of *Zimmerman, Myers & Kready,* for appellant.

*Paul A. Mueller,* for appellees.

OPINION BY KENWORTHEY, J., April 15, 1942:

This case involves the construction of a written contract for the sale of shares of stock. The action is by the assignee of the seller against the buyer. The court below held: (1) title to the shares passed to the buyer on the execution of the agreement, and (2) that although payment was deferred, the seller was not required to tender the stock and demand payment on the date of performance. Judgment was entered for plaintiff. Defendant has appealed.

On May 1, 1931, Jay N. Schroeder and Co., Inc. (hereinafter called Schroeder) owned forty-two hundred shares of the common stock of the Wilbur-Suchard Chocolate Company, and on that date entered into an agreement with the defendant and five other members of a syndicate. As stated in the second Whereas Clause, ".  .  .  .  .  . the said Syndicate have agreed to subscribe for said shares, and, by means of the plan hereinafter set forth, to assist said first party [Schroeder] to sell and dispose of the said stock to the pubic." The pertinent portions of the agreement appear in the margin.[1]

[1] "First: Each member of the Syndicate, for himself only, .  .  .  .  .  . hereby agrees with said first party [Schroeder], and with the other members of the Syndicate, to purchase and take and pay for, on July 1, 1931, at Five and 72/100 ($5.72) Dollars per share, the number of shares set opposite his signature hereto, or such portion thereof as shall not be sold at public or private sale, as hereinbelow provided.

"Second: The members of the Syndicate hereby appoint said first party as Syndicate Manager, for the purposes and with the powers herein expressed.

"Third: The said Syndicate Managers may at any time, on or before July 1, 1931, in its discretion, either personally or through such Bank, Trust Company or Banking Institution, as it may elect, offer for sale, the said forty-two hundred shares of stock, at not less than Six and 10/100 ($6.10) Dollars per share.

"Fourth: In case the number of shares of stock sold, as above

The agreement provided that each member "hereby agrees ...... to purchase and take and pay for, on July 1, 1931" the number of shares set opposite his signature. The number set opposite defendant's signature was seven hundred. Schroeder, under the agreement, was acting in a dual capacity; in some parts of the agreement he is referred to as "first party;" in others as "Syndicate Manager." As "Syndicate Manager" he was authorized to offer the stock for sale at not less than a minimum price, which was in excess of the price to the members of the Syndicate; he was authorized to pledge the stock for an aggregate sum not to exceed $24,000, which advances he agreed to repay out of the proceeds of the sale of any of the stock "or as and when received from the members of the Syndicate at the expiration of this agreement for all stock which at that time may remain unsold;" he agreed to render an accounting to the members of the Syndicate and that the proceeds "upon the termination of this agreement and the repayment of all advances or loans, with the interest thereon, which may be made as herein pro-

provided, is insufficient to make payment in full of the subscriptions for stock hereunder made by the members of the Syndicate, the same shall be applied on account of such subscription pro rata, and the several members of the Syndicate shall and will, in such event, make payments to or upon the order of said first party, on demand, on July 1, 1931, of the unpaid balance of their subscriptions respectively hereunder, receiving from said first party, the unsold shares of stock by them subscribed for hereunder.

"Fifth: The members of the Syndicate hereby severally agree that the said forty-two hundred shares of stock subscribed for hereunder, may, pending the payment of the subscriptions therefore, be pledged by said first party, as Syndicate Manager, as collateral security for advances to be made, not exceeding in the aggregate Twenty-four Thousand ($24,000) Dollars, said first party hereby agreeing to repay such advances ...... out of the purchase price received for stock which may be sold by said first party, under the terms of this agreement, or as and when received from the members of the Syndicate at the expiration of

vided by the said Syndicate Manager, be distributed and paid pro rata to and among the several members of the Syndicate."

On July 1, 1931, a new agreement was executed by the same parties. This agreement was identical in terms with the first except that the date of termination was postponed from July 1, 1931 to September 1, 1931.

The first agreement was assigned to plaintiff-bank on June 19, 1931, as collateral security for a loan to Schroeder, evidenced by a promissory note in the amount of $8,000. The second agreement was also assigned as collateral for a new note dated July 1, 1931 for the same amount, plus accrued interest.

This action was brought by plaintiff to recover one-sixth of the face amount of the note, no part of which was ever paid by Schroeder, together with interest. No demand for payment was made until September 13, 1935, and none of the shares of stock were tendered to defendant until June 1, 1940. None of the stock was sold to the public.

*First.* In our opinion the court correctly held that title to the stock passed May 1, 1931 on the execution of the original agreement. The Sales Act provides where there is an unconditional contract to sell specific

---

this agreement for all stock which at that time may remain unsold. The members of the Syndicate ...... hereby agree that said first party may assign and transfer this agreement, or its whole or part interest herein, as collateral security for any loans or advances which may be made ...... to the said first party ......

"Sixth: The proceeds which shall be received by the said Syndicate Manager from the sale of stocks made under this agreement in excess of Five and 72/100 ($5.72) Dollars per share, plus the expenses of such sale, shall, upon the termination of this agreement and the repayment of all advances or loans, with the interest thereon, which may be made as herein provided by the said Syndicate Manager, be distributed and paid pro rata to and among the several members of the Syndicate."

Introductory clauses and paragraphs numbered seventh, eighth, ninth and tenth have been omitted.

goods in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment or the time of delivery, or both, are postponed. Act of May 19, 1915, P. L. 543, Sec. 19 (1), 69 PS 143 (1). *Butcher v. Newburger et al.*, 318 Pa. 547, 179 A. 240. And although the words "to purchase ...... on July 1, 1931" might imply that the title was not to pass until that date, this language is not determinative, but the intention of the parties must be ascertained by construing the agreement in its entirety. *Orth & Bro. v. Board of Education*, 272 Pa. 411, 415, 116 A. 366; *Windmuller v. Fleming*, 129 Ill. App. 476; 3 Williston, Contracts (Rev. ed. 1936) p. 1779. It has been held that similar language does not manifest an intention to postpone transfer of title. See *Martin v. Adams*, 104 Mass. 262, where the sellers "agree to sell" and the buyer "agrees to purchase" and pay before a specified future date.

In our opinion it was the intention of the parties that the agreement was to have the dual purpose of immediately transferring the ownership of the shares to the syndicate members and of thereafter providing the terms upon which Schroeder was to deal with them as their agent. With minor exceptions,[2] which we do not consider controlling, wherever the agreement deals with the rights and liabilities of the seller, it refers to Schroeder as "first party," but wherever it purports to define his control over the stock subsequent to the execution of the agreement, he is referred to as "Syndicate Manager." The distinction is significant; and in our opinion, the manifest purpose was to give Schroeder

---

[2] In the fifth paragraph "first party" is used to indicate a function by the Syndicate Manager: "...... said first party hereby agreeing to repay such advances ...... out of the purchase price received for stock which may be sold by said first party ......" Even this phrase is reconcilable because in the same paragraph the right to pledge is given to "said first party, as Syndicate Manager."

the authority to deal with the shares, which no longer belonged to him, in a way which, without the express authority contained in the agreement, he could not deal. If it were intended that the ownership of the stock were to remain in him until July 1, 1931, or until the postponed date, September 1, 1931, there would have been no necessity for any such authority.

*Second.* Defendant next contends that even if he became the owner of the stock upon execution of the original agreement on May 1, 1931, either Schroeder, or the assignee bank, in order to recover, was bound to tender the stock and to demand payment on September 1, 1931, the postponed date of performance. It is generally the rule that where the date of payment is postponed, the seller must tender the goods and demand payment on the date fixed for performance or a reasonable time thereafter. *Barr v. Myers,* 3 W. & S. (Pa.) 295; *Seligman v. Beecher,* 36 Pa. Superior Ct. 475; 2 Williston, Sales (2d ed. 1924) Secs. 445, 446, 453. And if the rule were applicable, we would have no hesitancy in declaring that the failure to tender would defeat recovery, particularly where, as here, the shares in the meantime had been changed in character through reorganization. But just as the transfer of title is governed, this general rule may be modified, by the intention of the parties. There are, in our opinion, two features of the agreement which indicate that the requirement of tender by the seller was not contemplated. The first is the provision authorizing Schroeder to pledge the shares. The idea probably was that most, or all, of the shares would be sold by Schroeder to the public before the date fixed in the agreement for performance. But if sufficient funds to pay off the bank were not realized by sales to the public, the money which would be necessary to pay off the bank had to come from the syndicate members. How, then, could Schroeder tender the shares until *after* payment by the members? Since a substantial number of the shares

had been pledged, payment by the members had to come first in order to put Schroeder in a position to tender them to the members. In the second place, in the fourth paragraph of the agreement, which would have come into operation had *some* of the shares been sold to the public, the seller is specifically required to make demand for payment. The absence of any similar specific requirement for demand in the other portions of the agreement which operated here since no shares were sold, indicates an intention that such demand was not required. Compare *McCoach v. Philadelphia,* 273 Pa. 317, 322, 117 A. 71. Thus under the terms of this contract, the initiative rested upon defendant and the failure to demand payment and tender more promptly was not a default on the part of plaintiff-bank. *Duluth Superior Milling Co. v. Binenstock,* 106 Pa. Superior Ct. 322, 163 A. 56; 2 Williston, Sales Sec. 450.

The judgment is affirmed.