# JAMES A. RYLANCE

## *vs.*

## THE JAMES WALKER COMPANY.

*Sales of goods*: *refusal to accept; loss by fire; when vendor responsible.*

Where under the provisions of section 41 of the Uniform Sales Act (Code, Art. 83), the form of the bill of lading is not the *only* evidence of the intention of the seller to reserve property in the goods, the form of the bill of lading can not be interpreted as intended only for the purpose of securing the performance of the contract.                    p. 483

Where a vendee declines to accept the property sold and pay for it, the vendor may, (1) store or retain the property for the vendee and sue for the contract price; (2) he may retain the goods as his own and recover the excess of the contract price of the goods at the time and place of the delivery; or, (3) he may sell them at the vendee's risk and sue the vendee for the difference between the contract price and the price obtained at said sale.                    pp. 485-486

A seller, while retaining the possession and property of the goods sold, tendered them through his banker to the seller by a tender of the bill of lading in the name of the purchaser to be surrendered upon the payment of cash for the goods; the purchaser declined to pay the amount of the bill of lading without deducting therefrom a payment he had made for a former order of goods which, not being satisfactory, had not been accepted;

the seller left the goods with the carrier without instructions; the carrier, after leaving them on the dock for some days, finally stored them in a U. S. warehouse, where they were consumed by a fire; *Held*: that, as the vendor resorted to none of his rights, the purchaser should not be held responsible for the loss, of which his refusal to accept the goods was not the proximate cause.                                                                 p. 486

A "cash" payment in ordinary parlance is understood to be in contradistinction to a credit payment, and there is no more reason for supposing that the first is to be made in money than that a deferred or credit payment is to be so made when due.

p. 485

*Decided December 13th, 1916.*

Appeal from the Superior Court of Baltimore City. (GORTER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*George P. Bagby* (with whom was *Robert N. Baer* on the brief), for the appellant.

*John Henry Skeen* (with whom were *Arthur D. Foster* and *Benjamin Beck* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

In December, 1911, the appellee, The James Walker Company, of Baltimore, sent to the appellant, James A. Rylance, of London, England, an order for forty-seven coils of Hoth's Russian Bolt Rope at $13.50 per hundred pounds. In September, 1912, the appellant shipped to the appellee a different kind of rope and drew a draft on the appellee for

the price, which the appellee paid in advance of the arrival of the rope. When the rope shipped arrived in Baltimore the appellee discovered that it was not the rope ordered, and immediately wrote the appellant accordingly, and stated that as the appellee had paid the draft in advance of the arrival of the rope, it would charge the amount of the draft against him, and hold the rope subject to his order pending receipt of shipping orders from him. The appellant in reply requested the appellee to dispose of the rope for him, and after further correspondence, the appellee wrote the appellant in April, 1913, that it had not been able to dispose of the rope for him, and that while it did not mind holding the rope for him until he, the appellant, could dispose of it, the appellee would like to have a check for the amount of the draft paid by it.

On September 2nd, 1913, the appellee sent the appellant another order for seventy coils of Bolt Rope, to be shipped as soon as possible, "and in the usual way." At the same time the appellee again requested shipping instructions for the rope shipped to it in the fall of 1912, and which the appellee was holding for the appellant. The rope specified in the order of September 2nd, 1913, was shipped by the appellant to the appellee about the 5th of November, 1913, via steamship *Potomac,* and arrived in Baltimore about the 23rd of December following. The appellant had the bill of lading made out to his "order," and sent the same, properly endorsed by him, with a draft for the price of the rope attached, to Hambleton & Company, Baltimore bankers, with directions "to turn over the bill of lading" to the appellee upon payment of the draft. When the draft arrived, Hambleton & Company presented the same, with the bill of lading attached, to the appellee and requested it to pay the draft and take delivery of the rope. The appellee refused to pay the draft unless the appellant would allow it to deduct therefrom the amount of the draft which the appellee had paid for the shipment made in 1912. The appellant declined to

allow the deduction and refused to deliver the bill of lading. When the rope arrived in Baltimore, the appellee was notified, and the rope was unloaded and after remaining on the dock for a few days, was stored by the dock authorities, without any order from either the appellant or appellee, "in a U. S. Bonded Warehouse" where it was subsequently, about February 13th, 1914, destroyed by a fire. The agreed statement of facts states: "Neither plaintiff nor defendant exercised any acts of ownership over the rope after its arrival in Baltimore."

In April, 1915, the appellant brought suit in the Superior Court of Baltimore City to recover the contract price of the rope, etc. The *narr.* contains the common counts and two special counts. The first of the special counts alleges the sale and shipment of the rope in compliance with the defendant's order, and that it arrived in Baltimore "and was delivered to the defendant, or, but for the defendant's delay and neglect to accept delivery after a request from the plaintiff so to do would have been delivered to the defendant, but the defendant in breach of its contract, neglected and refused to pay for said rope or any part thereof, though payment has often been demanded." The last count alleges the order for the rope, the acceptance of the order and the shipping of the rope in consideration of the promise of the defendant to pay therefor upon its arrival in Baltimore, and that the defendant, although it had due notice of the arrival of the rope, and was requested to accept delivery of the same, "in breach of its contract delayed and neglected to accept such delivery and to pay for the rope or any part thereof, by reason of which neglect and delay, and without any order or request from the plaintiff, the rope aforesaid was stored in a warehouse in Baltimore, Maryland, and while stored was entirely destroyed by fire."

The defendant pleaded "never promised" and "never indebted" and a set-off. The case was tried before the Court without a jury, upon issues joined on the first two pleas and

on the replications of never promised, etc., to the defendant's plea of set-off. This appeal is from a judgment in favor of the defendant for the amount of the draft paid by it in the fall of 1912 produced in evidence.

The only exception in the record is to the ruling of the Court on the prayers. The Court below rejected the plaintiff's second, third and fifth prayers and granted the defendant's second prayer. These prayers are as follows:

*Plaintiff 2nd Prayer.*—The plaintiff prays the Court to rule as a matter of law that if the Court, sitting as a jury, find that an order for the rope mentioned in the declaration was given by the defendant to the plaintiff on or about September 2nd, 1913, and that rope of the quantity and quality ordered was shipped by the plaintiff to the defendant on or about November 5th, 1913, by the steamship "Potomac," and that said rope in due time and in all respects in accordance with the defendant's order, arrived in Baltimore and was unloaded from said steamship and placed on the dock, and that within a reasonable time after the arrival of said rope, the defendant was notified or knew thereof; and if the Court, sitting as a jury, further find that the plaintiff drew a draft upon the defendant for the price of said rope and forwarded such draft, with the bill of lading attached made out to the plaintiff's "order" and endorsed in blank by him, to his bankers at Baltimore, and that said bankers requested the defendant to take delivery of said rope, and tendered themselves ready, upon the payment of said draft, to turn over to the defendant the bill of lading for said rope, and that the defendant did not within a reasonable time after such request and tender pay said draft, and that as a consequence of the defendant's failure to pay said draft the rope was not delivered to the defendant but was stored in a warehouse, where it was subsequently destroyed by fire (if the Court, sitting as a jury, so find), and that the plaintiff did not exercise any acts of ownership over said rope from the time of its arrival at Baltimore, then the verdict must be for the plaintiff.

*Plaintiff's 3rd Prayer.*—The plaintiff prays the Court to rule as a matter of law that if the Court, sitting as a jury, find that an order for the rope mentioned in the declaration was given by the defendant to the plaintiff on or about September 2nd, 1913, and that rope of the quantity and quality ordered was shipped by the plaintiff to the defendant on or about November 5th, 1913, by the steamship "Potomac" and that said rope in due time and in all respects in accordance with the defendant's order, arrived in Baltimore and was unloaded from said steamship and placed on the dock, and that within a reasonable time after the arrival of said rope, the defendant was notified or knew thereof; and if the Court, sitting as a jury, further find that the plaintiff, for the purpose of securing the performance by the defendant of its obligations under the contract, drew a draft upon the defendant for the price of said rope and forwarded such draft, with the bill of lading attached made out to the plaintiff's "order" and endorsed in blank by him, to his bankers at Baltimore, and that said bankers requested the defendant to take delivery of said rope, and tendered themselves ready, upon the payment of said draft, to turn over to the defendant the bill of lading for said rope, and that the defendant did not within a reasonable time after such request and tender pay said draft, and that as a consequence of the defendant's failure to pay said draft the rope was not delivered to the defendant but was stored in a warehouse where it was subsequently destroyed by fire (if the Court, sitting as a jury, so find), and that the plaintiff did not exercise any acts of ownership over said rope from the time of its arrival at Baltimore, then the verdict must be for the plaintiff.

*Plaintiff's 5th Prayer.*—The plaintiff prays the Court to rule as a matter of law that the evidence (admitted, subject to exception), which deals exclusively with the rope paid for by the defendant in the fall of 1912, may only be considered in support of the defendant's plea of set-off.

*Defendant's Prayer No. 2.*—The Court, sitting as a jury, is instructed that if it finds from the evidence that the plain-

tiff, Rylance & Son, authorized the defendant to draw a draft upon the plaintiffs for the sum of $179.71 and expenses, which draft upon presentation was not paid by Rylance & Son and still remains due and unpaid, then its verdict must be for the defendant as against the plaintiff for the amount of the said draft and expenses.

The real question in the case is, who is to stand the loss caused by the destruction of the rope by fire?

Section 38 of Article 83 of the Code, which is a codification of section 35 of the Uniform Sales Act of 1910, Chapter 346, provides that: "Where there is a contract to sell unascertained goods no property in the goods is transferred to the buyer, unless and until the goods are ascertained." etc. Section 39 is as follows: (1) "Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred. (2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 40 declares that: "Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer." The first and second rules relate to contracts to sell specific goods, and rule four provides: (1) "Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller, with the assent of the buyer, or by the buyer, with the assent of the seller, the property in the goods thereupon passes to the buyer. Such assent may be expressed or implied, and may be given either after or before the appropriation made. (2) Where, in pursuance of a contract to sell the seller delivers the goods to the buyer, or to a carrier or other bailee (whether named by the buyer or not), for the purpose of transmission to or holding for the buyer, he is presumed to have unconditionally

appropriated the goods to the contract, except in the cases provided for in the next rule and in section 41. This presumption is applicable, although by the terms of the contract the buyer is to pay the price before receiving the delivery of the goods, and the goods are marked with the words 'collect on delivery,' or their equivalents." "Rule 5. If the contract to sell requires the seller to deliver the gooods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

Section 41 provides: "(1) Where there is a contract to sell specific goods or where goods are subsequently appropriated to the contract, the seller may, by the terms of the contract or appropriation, reserve the right of possession or property in the goods until certain conditions have been fulfilled. The right of possession or property may be thus reserved, notwithstanding the delivery of the goods to the buyer, or to a carrier, or other baliee for the purpose of transmission to the buyer. (2) Where the goods are shipped and by the bill of lading the goods are deliverable to the seller or his agent, or to the order of the seller, or his agent, the seller thereby reserves the property in the goods. But if, except for the form of the bill of lading, the property would have passed to the buyer on shipment of the goods, the seller's property in the goods shall be deemed to be only for the purpose of securing performance by the buyer of his obligations under the contract."

It appears from the agreed statement of facts, and from the invoice offered in evidence by the plaintiff that the goods were to be delivered to the defendant in Baltimore and that the freight was to be paid by the plaintiff. It would seem, therefore, clear that under rules four and five and section 41 the plaintiff by the terms of the appropriation of the goods to the contract reserved the property therein. Under rule five the property in the goods did not pass to the buyer upon

delivery of the goods to the carrier, and as under the bill of lading the goods were deliverable to the order of the seller, he thereby reserved both the property and right of possession. The agreed statement of facts states that "in order to secure the performance by the defendant of its obligations under the contract, the plaintiff had the bill of lading for said rope made out to the plaintiff's order and sent the same properly endorsed by the plaintiff with a draft for the purchase price of said rope attached, to Hambleton & Company * * * with instructions to turn over the bill of lading to the defendant upon payment of the draft," but it nowhere states that that was the *only purpose* of the appellant in having the bill of lading made out in the way it was. Where under the rules referred to the form of the bill of lading is not the *only* evidence of the intention of the seller to reserve the property in the goods, the form of the bill of lading can not be interpreted as intended only for the purpose of securing performance of the contract. *Hopkins* v. *Cowen*, 90 Md. 152.

Section 43 of Article 83 of the Code provides: "Unless otherwise agreed, the goods remain at the seller's risk until the property therein is transferred to the buyer, but when the property therein is transferred to the buyer the goods are at the buyer's risk, whether delivery has been made or not, except that: (*a*) Where delivery of the goods has been made to the buyer, or to a bailee for the buyer, in pursuance of the contract, and the property in the goods has been retained by the seller merely to secure performance by the buyer of his obligations under the contract, the goods are at the buyer's risk from the time of such delivery. (*b*) Where delivery has been delayed through the fault of either buyer or seller, the goods are at the risk of the party in fault as regards any loss which might not have occurred but for such fault."

As we have said, the seller retained both the possession of, and property in the goods, and there is no evidence to show that he reserved the property *merely* to secure performance

of the contract by the buyer. But the appellant contends that the tender of the bill of lading to the appellee was equivalent to the tender of the rope itself; that the appellee by refusing to pay the draft for the purchase price of the rope unless he was allowed to deduct therefrom the amount of the draft he paid the appellant in 1912 broke the contract, and that the loss caused by the fire would not have occurred but for such default of the appellee. He insists that the contract of 1912 and the contract of 1913 are distinct, separate and independent, and that the breach of the contract of 1912 by the appellant, did not warrant a breach by the appellee of the contract sued on in this case. He cites many authorities in support of this contention, and the further contention that a debtor can not apply a set-off in reduction of his debt and tender the residue, and that "unless otherwise agreed, the contract price must be paid *in cash.*" 28 *Am. & E. Enc. of Law,* 18; 22 *Am. & E. Enc. of Law,* 576; *Machen on Sales* (Vol. 2), sec. 1437; *Leven* v. *Smith,* 1 · Denio (N. Y.), 571; 3 *Elliott on Contracts,* sec. 1926; 35 *Cyc.* 264.

It is said in *Williston on Sales,* p. 465, that the situation for which sub-section (b) of section 43 provides "is rather for a delay or temporary fault, which is not, and perhaps can not be, treated as sufficient breach to terminate the bargain." That would seem to be the correct interpretation of the subsection referred to, for it refers simply to a *delay* of the delivery of the goods through the fault of either the buyer or seller, and not to such a refusal to accept delivery of, or to pay for the goods as amounts to a breach of the contract. Here the contention of the appellant is that the appellee by refusing to pay the draft broke the contract, and it can hardly be said under the circumstances that he simply delayed the delivery.

In *Foley* v. *Mason,* 6 Md. 37, the Court said: "Conceding that both the sale and delivery in this case were *conditional* upon payment in cash, that *the alleged usage* was clearly es-

tablished, and that this transaction took place in reference to that usage, still we regard the offer of the defendants to pay for the goods in the plaintiffs' own over-due paper, to be a virtual compliance with the condition, and for all practical purposes was equivalent to a tender of *payment in cash.* A *cash* payment, in ordinary parlance is understood in contradistinction to a *credit payment,* and there is no more reason for supposing that the *first* is to be made in *money,* than that a deferred or credit payment is, when due. Each payment must be made in the same way. The only difference, as before remarked is, that one must be made at the time of sale or delivery, the other when the credit has expired."

We are not required in this case to determine whether the appellee was justified in refusing to pay for the goods for the reason assigned by him. Assuming that the offer of the appellant to deliver the bill of lading in question was under the circumstances an offer to deliver the goods, and that the conduct of the appellee was in legal effect a refusal to accept the same and a breach of his contract with the appellant, the established rule in this State is that where a vendee declines to take the property and pay for it the vendor has the choice of three remedies: (1) He may store or retain the property for the vendee, and sue for the contract price. (2) He may keep the goods as his own, and recover the excess of the contract price over and above the market price of the goods at the time and place of delivery; or (3) he may sell them at the vendee's risk, and sue the vendee for the difference between the contract price and the price obtained at said sale. *Regester* v. *Regester,* 104 Md. 1; *Swartz* v. *Really Co.,* 106 Md. 290; *Tyng & Company* v. *Woodward,* 121 Md. 422. In *Tyng & Company* v. *Woodward, supra,* CHIEF JUDGE BOYD said: "The plaintiff could store the goods for the defendant and sue for the contract price, or it could keep the goods as its own and sue for the difference between the contract price and the market price, or he could resell them at the vendee's risk, and sue for the difference between

the contract price and the resale price." The same rule is recognized in *Williston on Sales,* sec. 555; *Dustan* v. *Mc-Andrew,* 44 N. Y. 72; *Ames* v. *Moir et al.* (Ill.), 22 N. E. 535; *Putnam* v. *Glidden,* 159 Mass. 47, 34 N. E. 81; *Moore* v. *Potter* (N. Y.), 50 N. E. 271; *Ackerman* v. *Rubens,* 167 N. Y. 405, 53 L. R. A. 867. These several remedies of the vendor are also provided for by the provisions of the *Uniform Sales Act.*

In the case at bar the vendor of the goods in question did not resort to any of the remedies open to him, but while reserving the property in, and the right to the possession of the goods, and refusing to deliver them to the vendee, except upon payment of the contract price, left them on the dock without making any effort to provide for their care or safety. The appellee could not take charge of the goods, and if the appellant had stored them for the appellee they might not have been destroyed by fire. The appellee should not therefore be required to suffer the loss of which his breach of the contract was not the proximate cause, and there was no error in the rejection of the plaintiff's second and third prayers.

The appellant could not under the circumstances have been prejudiced by the rejection of his fifth prayer or the granting of the defendant's second prayer, even if we were to hold that there was error in the ruling of the Court as to them, and we will, therefore, affirm the judgment of the Court below.

*Judgment affirmed, with costs.*