# DUDLEY A. TYNG AND COMPANY

## *vs.*

## FREDERICK E. WOODWARD.

*Pledges of stock : right to redeem; sale and purchase by pledgee at private sale; action for difference of price; pleading. Common counts.*

A pledge partakes of the nature of a mortgage, and is subject to the pledgor's equity of redemption.　　　　p. 430

A pledgee of stock has, in general, no right to dispose of it at private sale, unless the pledgor has given such authority.　p. 431

When stock is not listed or dealt in on the exchange, but is only sold by certain firms or parties dealing in it by correspondence, telegrams, etc., with brokers or others owning or interested in the stock, such stock may be sold privately, provided that the sale be fair, and the mere fact that, in such a case, the pledgee buys the stock himself does not make the sale invalid.

p. 436

Whether a sale, under such circumstances, was actually made to a third party for himself, or to him for the benefit of the pledgee, is always open to judicial examination, as it reflects on the question of fairness.　　　　　　　p. 436

When a prayer of the defendant recites that, under the pleadings, there is no evidence in the case legally sufficient to entitle the plaintiff to recover, on appeal all the pleadings are open for review.　　　　　　　p. 437

In such a case, if any count in the declaration is sufficient to support a verdict under the evidence for the plaintiff, the prayer ought to be revoked.                           p. 437

When upon the refusal of a purchaser to take or pay for stock bought for him at his request, the vendor resells the same at a less price and sues the purchaser for the difference, a common count for goods bargained and sold is not sufficient.

pp. 437-438

In such a suit a common count, reciting that the defendant purchased stock from the plaintiff at a price named, and agreed to pay the price thereof to the plaintiff, and that the plaintiff offered and tendered the stock to the defendant, who refused to pay for the stock or any part thereof, is bad.    p. 438

A count which, to the aforegoing, adds that the plaintiff, after due notice, sold such stock, in the usual way, for a certain sum named, less than the purchase price, it being the best price then obtainable for the stock, is bad unless it is further alleged that the plaintiff refused and still refuses to pay the difference.

p. 438

Unless the "money" counts of the common counts in a declaration be preceded by the words "for money payable by the defendant to the plaintiff," they are demurrable.          p. 438

When a judgment, found by the Court of Appeals to be correct, is based on grounds with which the Court of Appeals does not concur, the judgment may be affirmed, but the cause remanded, under section 22 of Article 5 of the Code of 1912, for a new trial.                           p. 438

In a suit by a broker against one who refuses to accept or pay for stock that had been purchased for him at his request, the broker may offer in evidence the unpaid draft that he had drawn on the purchaser, and to sustain the fairness of the transaction, where he sells and himself purchases the stock at private sale, he may offer in evidence letters from other brokers who dealt in the stock to show its market price on the day of the sale.             .              pp. 436, 439

*Decided June 26th, 1913.*

Appeal from the Court of Common Pleas of Baltimore City (ELLIOTT, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Horace S. Whitman* and *Thomas F. Cadwalader*, for the appellant.

*Arthur L. Jackson* and *C. H. Millikin*, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of the appellee, in a suit brought against him by the appellant, on a verdict rendered in pursuance of an instruction granted by the lower Court. The declaration originally included six common counts and four special counts and it was amended by adding an additional one. The foundation for the suit is the claim by the appellant that it sold to the appellee fifty shares of the capital stock of the Burroughs Adding Machine Company at four hundred dollars per share, and upon his refusal to accept and pay for them it resold them at $301.00 per share,—the suit being for the difference between the contract price and the amount realized at the resale.

As the appellant claims that it is entitled upon the evidence in the record to recover upon the first, seventh, ninth and the additional (eleventh) counts and does not contend that the others apply, we will briefly state what they are. The first is the common count "For goods bargained and sold by the plaintiff to the defendant." In the seventh it is simply alleged that the defendant purchased from the plaintiff the fifty shares of stock at $400.00 per share and the defendant agreed to pay said sum for the same, and the plaintiff offered

and tendered them to the defendant but he refused to pay for
them or any part thereof.   The ninth alleges that the defend-
ant offered to pay the plaintiff $400.00 per share for fifty
shares of that stock and the plaintiff accepted the offer and
tendered them to the defendant, who thereupon refused to
accept and pay for them.   The eleventh count is substantially
in the language of the ninth with this addition: "and the
plaintiff then, after due notice to the defendant, sold said
fifty (50) shares of stock in the usual and customary man-
ner in which said stock is sold in the market for the sum of
three hundred and one dollars ($301.00) per share, being the
best price then obtainable for the same by the plaintiff."
The defendant filed the general issue pleas of never indebted
and never promised.   There are eleven bills of exception con-
taining rulings on evidence and the twelfth contains a prayer
granted at the conclusion of the plaintiff's case, instructing
the jury "that the plaintiff has offered no evidence in this
case legally sufficient under the pleadings to entitle the plain-
tiff to recover, and therefore the verdict of the jury must be
for the defendant."   We will first consider that prayer.

The theory of the appellee in offering that prayer seems to
have been that the resale was invalid because there was no
public sale and no such notice given to the public as justified
the resale.   For that he relies on a number of decisions of
this Court, which we will refer to.   In *Maryland Fire Ins.
Co.* v. *Dalrymple,* 25 Md. 242, the plaintiff sued the insur-
ance company for damages for the sale and conversion of
certain shares of stock of the B. & O. R. R. Co., which he
had pledged to secure the payment of a sum of money lent to
him by the defendant.   It was agreed by the parties that if
the loan was not promptly paid the president of the insur-
ance company could, without further notice, sell the collat-
erals for the purpose of satisfying the loan.   Notice was
given the plaintiff to return the loan by the 14th of Novem-
ber, 1860, and on the 20th of that month the defendant pro-
cured the stock to be sold at the Board of Brokers, and be-
came the purchaser thereof at $55.00 per share—the stock

having from the date of loan to November 15th, varied in price from $79.00 to $56.50 per share. The stock was held by the defendant until the spring of 1862, when it was sold publicly at the Board of Brokers, fairly and in the usual way, in parcels to different persons at prices ranging from $60.00 to $67.00 per share—the ruling market prices. It was held that under the terms of the contract the notice given on the 13th of November was sufficient to entitle the defendant to sell on the 20th, that a sale "publicly and fairly made" at the Board of Brokers to a third person would have been a legal sale under the contract, but that the doctrine that persons holding fiduciary relations are incompetent to purchase the property held by them in trust was applicable to the relation of pledgor and pledgee. The sale on the 20th of November, 1860, therefore did not operate to vest the title in the defendant as purchaser, or to work a conversion of the stock—the plaintiff not having elected to treat that sale as a tortious conversion. But it was also held that as the bailment continued and the defendant caused the stock to be sold publicly at the Board of Brokers and transferred to the several purchasers, the latter sales were valid. It was said that no further notice was required by the contract, and no valid objection could be made to the place and mode of sale—not being impeached on the ground of unfairness or bad faith.

In *Balto. Marine Ins. Co.* v. *Dalrymple,* 25 Md. 269, some of the same questions were involved. Certain of the stock held by that company was sold to other persons, after notice of such intended sales at the Board of Brokers, but 770 shares of the B. & O. R. R. Co. stock was bought by the defendant through the agency of a broker employed for the purpose. On the next day the defendant sold the 770 shares to a Mr. Denison, and it was held "the defendant had not the legal right to dispose of the stock at private sale. The sale so made to Denison on the 21st of November, 1860, was therefore contrary to the duty of the defendant as pledgee and in law tortious, for which the plaintiff is entitled to maintain his action either in trover or case."

In *Bryson* v. *Rayner,* 25 Md. 424, in which there was a
bill in equity to compel the appellee to return 19 shares of
stock transferred to him as collateral security for the repay-
ment of loans, it was held that a sale of nine of those shares
made by a broker at *private sale* was valid—the appellant
having authorized the appellee "to give the stock to any
broker to sell on said day" in case they were not redeemed by
a certain time named, but as to the other shares which the
pledgee purchased, he still maintained the character of bailee
and they could be redeemed. It was said: "In the absence of
this special authority, according to the rulings of this Court
in the cases referred to (*Dalrymple cases, supra*), it would
have been the duty of the pledgee to have disposed of the
stock at public sale, after a reasonable notice to the public of
the time and place of sale, or at the public stock board."

It may be well, in order to avoid any misunderstanding,
to refer at this point to *Manning* v. *Shriver,* 79 Md. 41,
where it was said: "We agree that one being a trustee, execu-
tor or agent, or in any other like fiduciary relation, will not
be allowed to purchase property sold by him in that char-
acter. The rule is one of general application, and the reason
of the rule is, that one will not be permitted to purchase an
interest where he has a duty to perform inconsistent with the
character of purchaser. We agree too that both upon reason
and authority the relation of pledgor and pledgee comes
within the operation of this rule." The opinion then went
on to say: "But it is equally well settled that this rule does
not apply where the pledgor expressly authorizes the pledgee
not only to sell the pledge, but to purchase it in his own
right. * * * The purchase by a pledgee in such cases is ex-
empted from the operation of the general rule upon the same
ground that a mortgagee will be allowed to buy at his own
sale, if the mortgagor so agrees. In this case it will be ob-
served that the plaintiff was authorized to sell as agent, but
at the same time he was authorized to buy in his own right."

In *Rosenstock* v. *Tormey,* 32 Md. 169, the appellee, a
stock broker in Baltimore, was ordered upon October 4, 1866,

by N. Hoflin to buy 100 shares of Illinois Central Railroad stock on the joint account of Louis Rosenstock, J. Hoflin, and himself. Tormey immediately and, as he stated, "according to the course of trade and the regular custom of the business" directed his correspondents, who were brokers in New York, to make the purchase, which they did at $128.00 per share, and Tormey paid the purchase money ($12,825.00) therefor. The defendants failed to pay him, and on April 16th, 1867, "after notice to the defendants, and according also to the due course of trade and the custom of the particular business" the plaintiff directed his correspondents to sell the stock in New York, which they did and realized only $11,-400.00. The suit was to recover the difference between the amount paid on the purchase and that realized from the resale of the stock. The Court said the plaintiff had the right to make the purchase through correspondents, brokers or sub-agents in New York, and having made the purchase and expended his money, it was his duty to notify the principals of the fact and request them to receive the stock and pay him the price he had paid for it, with usual and reasonable commissions for making the purchase. Upon receiving the notice it was the duty of the defendants to pay for and receive the stock, and on their failure to do so the plaintiff had "the clear right after a reasonable time, and after giving notice to that effect to the defendants, to direct it to be sold in New York, and upon showing, by legal and competent proof, that it was actually sold by his agents, *either at public sale in market overt, or at a sale publicly and fairly made at the stock exchange or stock board, or a broker's board, where such stocks are usually sold,* at its fair market value, on the day of sale, he is entitled to recover from the defendants the amount, if any, of the resulting loss."

In *Worthington* v. *Tormey,* 34 Md. 182, the suit was also to recover the difference in the price of stock purchased by appellee for appellant and the amount at which it was resold, together with commissions and interest. The appellee purchased for appellant 200 shares of stock of the Canton Com-

pany through his brokers in New York.   Notice of the pur-
chase was sent by mail to the defendant at Reisterstown on
March 10th, 1868, who some days afterward called at the
office of plaintiff in Baltimore and refused to recognize the
transaction but requested him to do nothing until he could
see Mr. Jenkins.   The plaintiff held the stock until the 17th
instant when defendant notified him he would have nothing
to do with the transaction.   Immediately after the interview,
plaintiff wrote to the defendant that he would sell the stock,
without naming the place of sale, on or after the 19th instant,
unless he deposited with him sufficient margin, and also told
him he was prepared to deliver the stock on the tender of the
purchase money, commissions and interest, and would hold
it subject to his orders until the 19th.   The letter reached
Reisterstown next day, but possibly by reason of the plaintiff
having asked the postmaster in Baltimore to send it to the
postmaster at Reisterstown with request that he would note its
delivery to the person addressed, it was not delivered until
the 24th instant.   In the absence of any response to his letter
of the 17th, the plaintiff on the 21st sold the stock in New
York through the brokers who had purchased it for him.   It
was held that the letter of March 17th addressed to the de-
fendant at his postoffice was a sufficient notice to bind him,
notwithstanding he was in Baltimore on that day, and a
personal notice might by the exercise of reasonable diligence
have been served on him, and it was said: "It was not neces-
sary to name the *place* of sale in the notice, even if, in the
sales of other kinds of stocks held in pledge, it is necessary
to do so.   But we think that in the case of sales of stock by
bailees, it is not obligatory upon them to give notice to the
bailor of the *place* of sale."

In *Regester* v. *Regester,* 104 Md. 1, the plaintiff adver-
tised and sold 200 shares of the capital stock of the J. Reg-
ester Sons Co., which the defendant had agreed to buy from
him but failed to pay for it, by public auction at the sales
rooms of some auctioneers in Baltimore City.   The suit was
to recover the difference between the contract price still un-

paid and the net amount realized from the resale of the stock.
The declaration alleges amongst other things that "after due
notice to the defendant and after due advertisement thereof,
the plaintiff sold said two hundred shares of stock at public
auction for the sum of nineteen hundred dollars." How or
when such sales could be validly made was not discussed in
the opinion, but it was said by JUDGE BURKE, who spoke for
the Court, that "The plaintiff's second prayer asserted a
sound legal principle, and he was entitled to a verdict, if the
jury found the facts therein stated. The doctrine upon which
the instruction rests is abundantly supported by authority."
Of course it was only necessary in passing upon that prayer
to determine whether what was done was sufficient, and the
Court was not called upon to say, and did not say, whether
such a sale made in any other way than by public auction
after a public advertisement would have been sufficient, al-
though the method adopted in that case was distinctly ap-
proved. It was also said that "whether an unpaid seller has
exercised reasonable diligence in the conduct of a resale upon
the default of the buyer is a question of law for the Court on
facts to be found by the jury."

It will be observed that the cases in 25 Md. cited above
were all between pledgor and pledgee. In that class of cases
it has been distinctly decided that the pledgee has not the
right to dispose of such stock at private sale, although that
would be subject to the same modifications made in reference
to the pledgee becoming purchaser at his own sale, for if the
pledgor had agreed that the sale could be made privately it
could be done, provided of course it was fairly done. The
relation of pledgor and pledgee differs materially from that
of seller and purchaser. A pledge partakes of the nature of a
mortgage and is subject to an equity of redemption. The
terms of sales made by pledgees are now in most cases fixed
by the parties, as the use of collateral notes is so general that
it is unusual to meet with such loans where the conditions
under which sales can be made are not prescribed, and al-
though in the absence of agreement it has been held that

goods pledged cannot be sold at private sale, yet they may be so sold by agreement of the parties.

This Court has not, however, decided that such a sale as we are now concerned with cannot be made at private sale. It is true that in *Regester* v. *Regester* we approved of the sale at public auction, but we did not say that was the only way such sales could be made. In *Rosenstock* v. *Tormey, supra,* we have pointed out several ways, other than by public auction, in which they could be made. It would necessarily result in a great sacrifice if stocks had to be sold at public auction and cou..d not be "where such stocks are usually sold." The stock now in question was not listed on any exchange, according to Mr. Andrews, who is connected with the plaintiff, and he testified: "It is either bought and sold by mail or telegram or long distance telephone with the individual holders or other brokers representing the individual holders," and in answer to the question how they advertised that stock when they had it for sale, he said: "We have a list of stockholders and brokers who deal in it, and we send out bids and offerings to this list." His company was in the regular business of dealing in unlisted bonds and stocks, and amongst others they had dealt in the stock of the Burroughs Adding Machine Company for about seven years. He named brokers in Chicago, New York and Detroit (the home of the Burroughs Company) who dealt in it.

The testimony shows that the appellee had previously dealt with the appellant in this stock. On August 31st, 1911, the appellant company sent out a circular offering 20 shares of this stock at $418.00 and requesting parties in the market to buy at or near that price to communicate with them. A return postal was enclosed and the appellee on September 2nd, 1911, wrote that he was interested in that stock and would like to be advised as to any changes in the market, and added "I would buy some shares at what I consider right prices, but not at 418." On September 5 plaintiff telegraphed him, "Please wire best bid and amount Burroughs Adding Machine," to which he replied, "Four hundred dol-

lars per share, any part of fifty Burroughs." Mr. Andrews called him by long distance telephone and said he could deliver at $405.00 and he was working on his order to buy at $400.00. He said appellee replied he would not give over $400.00, and that he would give them until the next day to fill the order: That afternoon appellant wired appellee, "Sold you 50 Burroughs Adding, 400 net. May possibly get 50 more in morning. Can you use?" The same day he wrote to appellee quoting the telegrams that passed between them, confirming the sale, and enclosed blank for him to sign. Two or three days afterwards they received from appellee a letter having on it letter heads of the Burroughs Adding Machine Co.. Baltimore office, 12 St. Paul St., and dated September 6, 1911, in which he said that they were to wire him regarding the price at which they could obtain the stock before committing him, and the person who was to put up the cash "has exercised the privilege of a change of mind." The appellant replied by telegram on September 8th, in which after stating they had sold him the stock at $400.00 and had paid for it, they said, "It is in shipment. We must insist upon your taking up draft. Otherwise stock will be sold at first bid and we will recover difference from you. We know nobody in this transaction but yourself." In ordinary course of mail they received a letter from the appellee dated September 8th—same date as the appellant's telegram—in which appellee said the draft had been refused because in his telephone communication he did not authorize them to purchase the stock on his account. On September 11th the appellant sent him a long letter in which it said: "We will have to sell the stock out and collect the difference from you through due process of law," and, "We will carry this matter through to the bitter end, and it looks as if we would have to sell this Burroughs out at a heavy loss if it is sacrificed at the present time." Mr. Andrews went to Baltimore to see the appellee. He said he explained to him that the bank had given them credit for the draft, and would compel them to sell it out, and as the market on Burroughs was a very wide market,

they probably would have to sacrifice it.   He asked appellee if he would not make some kind of proposition to help to take care of the matter; that perhaps they could carry it along and not have to sell it out right away if he could raise some money to protect it.   At the railroad station as he was leaving, he told the appellee "if he wouldn't do anything, I simply would have to sell it out when I got back; that I would have to make good with the bank; that we would be overdrawn twenty thousand dollars and I would have to sel it, and if there was any difference we would have to sue him for the difference."   He replied they could sue him if they wanted to, that he was "judgment proof," and Mr. Andrews replied, "If that is the kind of man you are, I will sue you whether you are good or not, and I went home and sold the stock out."   On September 15th, which was apparently the day after he was in Baltimore, he wrote. "On my return I found no better bid than $300.00 for Burroughs Adding Machine, and the bank demanded that we immediately take up your protested draft.   I finally found a purchaser for 50 shares at $301.00 per share today, and, therefore, sold the stock for your account."

He said he had sent an offering of the stock "To all the brokers that I knew handled the stock and to all the stockholders in the company," that he had called up a man in St. Louis who bid $300.00 and also another party who held some of the stock offered $300.00.   He called up White & Co. of New York but did not get any bid from them and the two bids mentioned above were the only "firm bids" he got.   He said he had spoken to his aunt who was living at his house a few nights before about it and had told her if it went cheap he would advise her to get it.   He called her up at his house in Evanston, near Chicago, and told her of the bids he had received and advised her to make a better bid.   She authorized him to use his own judgment and he placed a bid with the appellant at $301.00 and confirmed the sale that day.   The circular the appellant sent out was as follows:

"Dudley A. Tyng & Co., Brokers, 108 S. La Salle Street, Chicago. Chicago, Sept. 12, 1911. Important. Sacrifice Sale of 50 Shares Burroughs Adding Machine Co.

"On Sept. 5th we sold 50 shares of Burroughs Adding Machine Co. to one of the company's agents at $400.00 per share. The draft has been protested, owing to the buyer's inability to care for same, and the stock has been thrown back on our hands.

"This stock will be sold by us to the highest bidder for his account.

"We have no bid whatever at this writing, and we urge you to submit us one. The stock has to be sold, so don't be backward about bidding, even if your bid is a low one. Bids may be wired at our expense. Very truly yours, Dudley A. Tyng & Co."

What we have stated shows how and to whom the sale was made, and the notices the appellant had given the appellee. We do not feel justified in holding as a matter of law that the sale was invalid. To have offered the stock at public auction under the circumstances might have resulted in a greater sacrifice than was made of it. There are many cases in which a sale at public auction will necessarily result in a sacrifice of the property, and if Mr. Andrews' testimony is correct, that this is the way this stock is sold—not being listed and hence not being sold on an exchange—it may be that better results can thus be obtained than could possibly be at public auction. Our own decisions have not held that a sale thus made by a seller, and not made at public auction, is invalid, and as many Courts of high standing have distinctly said that there is no rule of law making it necessary for such sales to be by public auction, and this Court has fully recognized the right to sell stocks as they are customarily sold, we are of the opinion that the jury should have been permitted to pass on the facts under proper instructions from the Court. In the prayer approved in *Regester* v. *Regester* the Court left to the jury to find whether the "notice of sale was fair and

reasonable," that "said sum was the highest price the plaintiff could obtain at said auction sale, and that the plaintiff in making said sale acted with fairness and in good faith," etc.

The law is thus stated in 35 *Cyc.* 523: "The manner of sale is within the reasonable discretion of the seller; but it should be made in good faith and in the mode best calculated to produce a fair price for the goods, and as the seller acts as agent of the original buyer, he is held to the same degree of care, judgment and fidelity as an agent in possession of goods with instructions to sell to the best advantage. Although the sale may be by public auction, it is not necessary that it should be, unless that is the usual mode of selling that particular kind of goods, and thus ordinarily the resale may be by private sale if it is conducted fairly, but if the custom is to sell through a broker, the goods should be offered through a broker's agency. The sale should be for cash. Slight irregularities in making the sale will not invalidate it, and the mere fact that the seller bought in a portion or all of the goods himself is no ground of objection if the price obtained is a fair one." In 24 *Am. & Eng. Ency. of Law* 1142, it is said: "The authorities lay down no particular rule as to the manner in which a resale must be made; but since the measure of damages is to be ascertained by this means, it is essential that the seller act in good faith and under such circumstances as will be best calculated to produce the fair value of the property."

In *Sands* v. *Taylor,* 5 John. 395, cited in *Regester* v. *Regester,* the sale was made at auction, but in *Pollen* v. *LeRoy,* 30 N. Y. 549, the Court, in speaking of that fact, said: "But there is nothing in the opinions delivered by the judges in that case, requiring or insisting upon such course." In *Van Brocklen* v. *Smeallie,* 140 N. Y. 70, it is said: "Where the second method is adopted and the vendor chooses to make a resale, that need not be at auction, unless such is the customary method of selling the sort of property in question, nor

is it absolutely essential that notice of the time and place of sale should be given to the vendee." It was said in that case that, "The adjudged rule covers every species of personal property." In *Clews* v. *Jamieson,* 182 U. S. 496, the Supreme Court approved of a sale of stock at auction—the stock exchange being closed from August 3rd until November 5th— but it did not say that method was necessary in all cases. In *Camp* v. *Hamlin,* 55 Ga. 259, trees, plants and vines were sold at public auction, but the Court reversed the case because the circumstances of the sale were not shown—saying: "The plaintiff should enter into a more full and minute accounting as to the auction, in order to use it as a final test of value." In *Brownlee* v. *Bolton,* 44 Mich. 218, the Court said: "It is now sufficient to say generally that the vendor's right of resale must be exercised in good faith and in such time and manner and under such circumstances and by such methods as would be best calculated to produce the fair value of the property, and that in case he seeks to avail himself of it before a jury it is incumbent on him to adduce the necessary facts to show that in exercising the right this manner was observed." In *Sedgwick on Damages* (281) (6 ed.) it is said: "Though perhaps more prudent, it is not necessary that the sale should be at auction; it is only requisite to show that the property was sold for a fair price." See also *Pratt* v. *S. Freeman & Sons Mfg. Co.,* 115 Wis. 648, S. C. 92 N. W. 368; 2 *Des Passes on Stock Brokers,* 909.

Under these and other authorities which might be cited, we cannot say that the record shows that the sale was invalid, because not made at auction, or that it was not sufficiently advertised. Whether or not it was the proper way to make the sale under the circumstances, whether it was fair and produced the market value will be for the jury to say under instructions of the Court as to what diligence was required. Of course it will be admissible to inquire into the question whether the sale was really made to Mrs. Dutton or to the company itself, as that reflects upon whether the sale was fair. What is said in *Steelman* v. *Weiskittel,* 88 Md. 519,

about the sale to the attorney of a pledgee who afterwards sold them to the pledgee may reflect upon the question, although that was a case of pledgor and pledgee. As this record stands Mrs. Dutton, and not the appellant, would seem to be the purchaser, but if the jury should find that the appellant was in reality the purchaser then the sale to it was not valid unless fairly conducted and the full market price was realized.

The grounds relied on by the appellee to sustain this prayer did not in our judgment authorize it being granted. We must, however, under the form of the prayer examine the pleadings, which under our practice a prayer thus referring to the pleadings requires us to do. We will as briefly as we can refer to the different counts, for if any one of them was sufficient to support a verdict under the evidence for the plaintiff the prayer ought to have been rejected. The appellant contends that the first, seventh, ninth and additional (eleventh) counts are sufficient. The first is not. It is said in 19 *Ency. of Pl. and Pr.* 21, that, "After a resale by the vendor an action for goods bargained and sold will not lie, but the proper remedy is by an action for damages for non-acceptance." In the case of *MacLean* v. *Dunn,* 4 Bing. 722, cited by the appellant, BEST, C. J., said: "It is a practice founded on good sense to make a resale of a disputed article, and to hold the original contractor responsible for the difference * * * Where a man in an action for goods sold and delivered insists on having from the vendee the price at which he contracted to dispose of his goods, he cannot, perhaps, consistently with such a demand, dispose of them to another." It is true he spoke of the count for "Goods sold and delivered," and not for those "Bargained and sold," but the same principle and reasoning would apply. The same may be said of the seventh and ninth counts. As the evidence shows that the stock had been sold by the plaintiff they are not such counts as are applicable to those facts. For all that appears in them, the plaintiff might have made a large profit out of the stock by reason of defendant's refusal to pay for them, and the

defendant had no notice by either of those counts that the plaintiff had sold the stock. The plaintiff could store the goods for the defendant and sue for the contract price, or it could keep the goods as its own and sue for the difference between the contract price and the market price, or it could resell them at the vendee's risk, and sue for the difference between the contract price and the resale price. No one would suppose from those counts that the plaintiff had elected to do the latter.

The eleventh count was right as far as it went, but it ought to have gone further and have alleged that the defendant refused and still refuses to pay the difference, or something to show some indebtedness. All that the count alleges may be true and yet the defendant may have paid the plaintiff the difference and may not have owed it one dollar when the suit was brought. Our system of pleading is very liberal, but even the common money counts must be preceded by "Money payable by the defendant to the plaintiff" and are demurrable, if not; (*Merryman* v. *Rider,* 34 Md. 98); and the form given in the Code for a suit on a promissory note concludes by the averment, "but did not pay the same." The count was therefore in our judgment technically bad, but inasmuch as the prayer was apparently based on grounds which we do not concur in, we will, under section 22 of Article 5 of the Code, affirm the judgment but remand the case for a new trial, unless there be some reason in the other exceptions for a reversal.

This requires us to pass on the exceptions to rulings on the evidence, which can be briefly done. The draft referred to in the first bill of exceptions should have been admitted in evidence. The plaintiff had the right to let the jury see that it still had it, and also that it was not made payable at a time subsequent to the date of the resale. We see no error in the rulings in the second, third, fourth, fifth, sixth and eleventh bills of exception. They were relevant in inquiring into the fairness of the sale. The letter from White & Co. in the seventh bill of exceptions was properly admitted. Mr.

Andrews said he thought he had received it. It was dated two days before the resale of the stock and stated: "We quote the market today on Burroughs Adding Machine Company, 380 bid, offered at 395." Mr. Andrews said White & Co. were amongst the brokers who dealt in this stock and the letter was clearly relevant as reflecting upon the question whether the plaintiff was acting in good faith and doing what was best calculated to produce the best price for the stock. The inquiries in the eight, ninth and tenth exceptions were also relevant, as under the circumstances it was proper to ascertain whether Mr. Andrews' aunt, who was at his house, was the purchaser or whether it was put in her name, although really purchased for the plaintiff. It must be remembered that the plaintiff claims to have sold this stock to the defendant on September 5th at $400.00 per share, and a few days before he had asked $418.00, and as it was sold on the 15th at private sale to an aunt of Mr. Andrews who was acting for the plaintiff in the transaction—that aunt then being at his house—at $301.00, the circumstances demand a full and thorough investigation and great latitude should be allowed in the examination of the witnesses.

The only ruling on the exceptions to the evidence as to which we differ with the lower Court is that in the first bill but as it was immaterial when the prayer which took the case from the jury was granted, and as the plaintiff was not injured by the ruling, we will not reverse the judgment but will follow the course indicated above. When the case is remanded the appellant can amend the declaration to cure the defect in the eleventh count pointed out by us. ·

> *Judgment affirmed and cause remanded for a new trial under Section 22 of Article 5, the appellant to pay the costs in this Court and the costs below to abide the result of the case.*