IRVING B. KEMP *v.* MAYNARD C. KEMP ET AL.
[No. 30, October Term, 1940.]

646

*Decided December 17th, 1940.*

The cause was argued before BOND, C. J., PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*James Morfit Mullen* and *R. Contee Rose,* with whom was *Howard C. Bregel* on the brief, for the appellant.

*Nathan Patz,* for the appellee.

BOND, C. J., delivered the opinion of the Court.

The case arises upon a claim by the appellant to shares of stock in a corporation, all of which stand in the name of his brother, the appellee Maynard C. Kemp, and upon a cross-claim by the corporation, another appellee, for money alleged to be due to it by the appellant. The stock had been pledged as collateral for notes, and sold or appropriated upon default in payment, and the appellant's claim is that one portion of it, pledged by a Charles R. Bowman, was bought by Maynard Kemp not for himself alone, but for the benefit of himself and his two brothers, including the appellant, and that as to the other portion. which had been owned and pledged by the appellant him-self, the contract of pledge had been abandoned before the sale or appropriation. The decree appealed from dismissed the appellant's bill of complaint, and on the cross-bill awarded the corporation a money decree against him for $78,954.20.

The appellant had been sued by the corporation in the Superior Court of Baltimore City on September 8th, 1939, for the amount of the indebtedness claimed, $78.-954.20, and on October 21st, 1939, he filed his bill of complaint in this proceeding, averring the interests he claims in the stock, and in it prayed that a trust for the stock of the corporation be declared, that there be an accounting of the debts and credits of the parties, that the suit at law be enjoined meanwhile, and that he have other incidental relief. Answers were filed, and were followed by the cross-bill which asserted the debt sued on at law, thus seeking a determination of all parts of the controversy in one suit. There are no objections to procedure.

The appellant, Irving B. Kemp, had in 1918 started a dairy in Baltimore City, first alone, and after about a year in conjunction with his brothers, Maynard C. Kemp and DeWitt E. Kemp. The name of the dairy was the Cloverland Dairy, and on the letterheads and on delivery trucks the name Kemp Brothers was added. The two brothers Maynard and DeWitt, up to that time, had been in the grocery business. Irving Kemp continued to

be, at least, the chief owner of the milk business, and its manager. From small beginnings it grew and became in the next ten years one of some magnitude, and was profitable. In August of 1929 this business was consolidated with that of a Timber Grove Dairy, owned at the time by Charles R. Bowman, and for the whole a corporation named the Cloverland Farms Dairy, Inc., was formed, with the three brothers Kemp as the incorporators and directors. Nine thousand shares out of a total authorized issue of 15,000 were issued, and were divided 4500 to Charles R. Bowman, and 4500 to Irving Kemp, but one of Irving Kemp's shares was issued to DeWitt Kemp to qualify him as an incorporator and director. Shortly after the incorporation, 900 shares of the 4500 allotted to Irving Kemp were issued to Maynard Kemp upon his demand for representation in stock of his interest in the business. He had contributed $5000 to it when it was carried on in unincorporated form. The 900 shares, subtracted from Irving Kemp's 4500 allotment, left him 3599 shares; and that is one of the two portions of the stock in controversy.

Soon after the beginning under the corporate form, Irving Kemp began drawing upon the funds in amounts large and small over and above his salary; and Bowman followed. By the end of the year of incorporation, 1929, Irving Kemp had become indebted to the corporation for $6826.95, exclusive of interest, and by July 14th, 1932, he owed it $142,410.16 principal amount. Bowman began by drawing $45,000 in June of 1931. By the end of that year he owed $157,500, exclusive of interest, and on July 14th, 1932, he owed $83,112.50. He needed more money at that time, and he and Irving Kemp agreed that $60,000 more should be drawn by him to make his indebtedness or drawing equal to that of Kemp. The equality was attained by an additional loan of $484.79 to Kemp. The corporation did not have the $60,000 to be drawn by Bowman, and was put in possession of it by the device of having Irving Kemp make out his note for the amount to the corporation, and attach as collateral his

stock certificate for 3599 shares, and then having the Dairy borrow the money from the First National Bank on the corporation's note to it, with Irving Kemp's note to the Dairy and the stock certificate attached for collateral. The money was then passed to Bowman and he gave the Dairy his note for it. Bowman had already pledged his 4500 shares for a previous loan from the bank. The total shares of the Dairy were then in this situation: Bowman's 4500 shares had been pledged with the bank; Irving Kemp's 3599 shares were pledged, first with the Dairy and subsequently with the bank; Maynard Kemp's shares, 900, were at that time free from pledge, as was DeWitt Kemp's one share.

In May of 1933 a dividend was declared, described as a cash dividend, but paid in notes, and Irving Kemp and Bowman offset their respective portions against their indebtedness. Bowman's debt was cancelled in the process, Irving Kemp's reduced. There was never any other dividend. The drawing continued, and balance sheets of the corporation taken from time to time showed that, at the end of the year 1933, Irving Kemp owed $38,-137.13, and, on June 30th, 1937, owed $71,532.34.

Bowman died in 1933, and subsequently two directors, Cowan and Fulton, were given places on the board to represent the Bowman interest. As Irving Kemp owned only a minority of the stock to be voted, and Maynard Kemp was dissatisfied with the conduct of the corporate affairs, a contract of sale of Maynard's 900 shares to Irving was executed on November 2nd, 1935. The price named was $54,000, and for that amount Irving gave Maynard $5000 in cash and ten notes for the remaining $49,000, payable six months apart, and for collateral security certificates for the 900 shares purchased, with a stock power added, and Irving Kemp's 3599 shares, already pledged, as stated, for the debt to the bank, then reduced to $50,000. A proxy for voting the shares was given to counsel for Irving Kemp. The notes were never paid; default occurred when the first fell due in May of 1936, and ultimately the shares pledged for the notes

all passed into the apparent ownership of Maynard Kemp under the supposed authority of the notes.

In the years 1936 and 1937 the corporation lost money. Besides the indebtedness to the bank, then about $40,000, it owed $90,000 to a Co-operating Milk Producers, Inc., its largest creditor, and still owed Maynard Kemp $16,-000 on his portion of the dividend notes. A balance sheet taken on June 30th, 1937, showed current assets of $69,184, of which only $6339.76 was in cash, and current liabilities (including a mortgage of $36,000) of $228,-074.38. There was dissension among shareholders and directors, and corporate action was somewhat obstructed by the equal division of voting power. In this situation Maynard Kemp, on September 16th, 1937, filed a bill of complaint seeking the appointment of a receiver to preserve the assets, and for the dissolution of the corporation. The Milk Producers intervened as a complainant. The receiver was not appointed, for during some extensions of time granted for answering, and a week after the answer was filed, Maynard Kemp, in an effort at rehabilitation, acquired the Bowman shares in his name. Conferences with the bank and with the Milk Producers secured extensions of credit, and the proceedings for the appointment of receivers were dismissed. The bank required as a condition to its aid that some officer sign all checks of the Dairy with Irving Kemp, and the Milk Producers required that he should not be in a position to handle the finances, and that Wendell H. Baker, secretary and treasurer, be made one of the directors. Mr. Laban Sparks, general counsel of the Milk Producers, testified that in Irving Kemp's presence at the conference it was stated and understood, without contradiction, that Irving Kemp was no longer a stockholder.

At a meeting of the directors on April 18th, 1938, it was voted that Irving Kemp be granted a leave of absence, on pay, and he made no objection, withdrew, and has not since returned to the place of business. The salary payments were continued until June of 1939, when, as testified by Maynard Kemp, it was heard that he had

become employed by a competing dairy. He is now president of the competing dairy. He testified in January, 1940, that he held no stock in it, and had no option to buy any, but a contract of August 21st, 1939, showed that he was to receive half the stock when the net returns of the business should reach a point to be fixed subsequently.

The question presented by the claim for a portion of the Bowman shares purchased from the bank in the name of Maynard Kemp is almost entirely one of fact. It appears that Irving Kemp had some discussion in 1936 with Mr. Isidor Goldstrom, who represented the Bowman estate, regarding purchase for himself, but nothing came of it. Again, in the summer of 1937, he tried to borrow $18,000 from Maynard Kemp to aid in such a purchase. He had no money, and could buy only by borrowing it. Maynard did not lend the money, but Irving Kemp thought he could get it from him. He continued, trying to borrow from a Mr. Hoffberger later in the same year. He testified that he was going to refinance the business by an issue of preferred stock, and discussed it with brokers, but the proposal went no further. In these efforts, it seems, Irving Kemp was acting for himself alone. All of them came to nothing.

The efforts of Maynard Kemp followed after the bill for receivership and dissolution was filed, but when he made an offer to buy the Bowman stock he found that Mr. Hoffberger had now bought it for Mr. Emanual Gorfine, paying partly in cash and partly in a note of Mr. Gorfine's to the bank. On October 6th, 1937, however, the stock was bought from Mr. Gorfine in the name of Maynard Kemp at an advanced price; and it was paid for by Maynard Kemp's own certified check and his note.

If there was any connection between the efforts of the two, any joint adventure in the purchase of this stock, it has not been proved. On the contrary all the documentary evidence shows at least an ostensible purchase by Maynard for himself. He was the only one who had money and credit sufficient for the purpose. Loans obtained from individual friends to aid in the purchase

were made to him. And coincident with the purchase the three brothers signed a paper addressed to Messrs. Hoffberger and Gorfine, expressing consent and approval of the sale to Maynard, and adding, "Mr. Maynard C. Kemp signs hereunder as the sole purchaser thereof." All the arrangements with the creditors for rehabilitation of the corporation were made by Maynard Kemp alone, as the sole owner of the stock, and Irving Kemp, cross-examined on his contention, said there was no definite arrangement for his sharing in the stock purchased, that nothing was ever agreed on; and that would leave nothing for the court to enforce, nothing to serve as foundation for a trust. *Zulver v. Murray,* 139 Md. 242, 244, 114 A. 896. Further, he left the stock in Maynard's hands, voted, and possibly the basis of dividend payments to Maynard, without any claim upon it for two years.

Irving Kemp's testimony would discourage acceptance of his contention if on the testimony as a whole the point were left close. He professed forgetfulness of many facts which it seems he must almost certainly remember; his answers obviously evaded facts at times; there were contradictions in it, and there were conflicts with documentary proof. He was very indefinite as to important facts. Measured by the burden upon him, his testimony falls surprisingly short.

The court can only hold that his claim to a portion of the purchased Bowman stock is unsubstantiated. *McRae v. McRae,* 78 Md. 270, 27 A. 1038.

The claim for return of the 3599 shares pledged with the notes given on the contract for purchase of Maynard Kemp's 900 shares is likewise found insufficiently supported by evidence of abandonment of the contract. As already stated, $5000 in cash and ten notes for $49,000, total principal sum, were given by Irving Kemp at the execution of the contract, and neither the money nor the notes were ever returned or asked for. And a business man, after putting his purchase in that form, would hardly let the condition continue after a release or aban-

donment of the contract. Irving Kemp testified that in May of 1936, when the first note fell due, the two parties interested discussed the transaction and decided not to go through with the purchase. Maynard Kemp denied that there was such a discussion, and testified that when in court on September 24th, 1937, on the second application for extension of time for answering the bill for a receivership, demand for payment was made upon Irving, in the presence of his counsel, and on Irving's replying that he could not pay, Maynard said he would exercise his rights according to the pledge agreement and have a sale, and take it over, and that Mr. Paul C. Wolman, Irving's counsel said, "There is nothing we can do. That is your right." Mr. Wolman, called as a witness for the complainant Irving Kemp, had forgotten some details of the conversation, but said that it was with respect to payment of these notes, and that the general purport was that the balance due was treated as a matter to be worked out in connection with the reorganization. And that conversation, recognizing the existence of the indebtedness, took place nearly a year and a half after the time when, according to Irving's testimony, the parties had decided to abandon the contract altogether. Again, at a meeting of the directors on October 7th, 1937, in the presence of Irving Kemp, it was stated, and not contradicted by him, that Maynard Kemp was then the only stockholder. And not until the suit against him in 1939 did Irving assert any of the rights of a stockholder, or claim the stock.

Contrary to the theory of a subsequent appropriation of the stock is cited an averment in Maynard's bill of complaint, seeking the receivership, filed on September 16th, 1937, that he then owned the 900 shares he had contracted to sell. His assumption of ownership at that time, it is argued, could only be based on a previous abandonment of the sale. But it seems to be a sufficient answer that if there is any inconsistency in this it is slight, and not enough to contradict the evidence that the contract and the debt on the notes were regarded as still

in force. The retention of the 900 shares by Maynard after September, 1937, cannot be regarded as inconsistent, for the 900 shares too were pledged as collateral on the notes. They are not claimed by Irving, apparently. On the question of fact, the court agrees with the finding of the chancellor below that the contract is not shown to have been abandoned.

But a question of law arises from the manner of acquiring the stock pledged, that is, from the mere appropriation and cancellation of the indebtedness by Maynard Kemp. It appears that, upon the declaration of Irving Kemp's attorney, in Irving's presence, on September 24th, 1937, that the debt to Maynard could not be paid, and that it was his right to sell the collateral under the power in the notes, he, Maynard, went to the office of his counsel and there calculated the amount due on the notes with interest, about $53,900, and then "went through the procedure of taking the stock over." And he appears to have given the secretary of the Dairy, Mr. Baker, the certificate and the stock power attached to the pledge, in assertion of his right to the stock. No new certificate was issued then, or until the debt to the bank was paid, which was in April of 1939. By the terms of the contract all the notes became due upon default in payment of the first, and it seems to be assumed, although not definitely stated in evidence, that the whole debt of $53,900 was cancelled.

The power given in the event of default was to sell at public or private sale, at such time and upon such terms as Maynard Kemp might determine, without demand, advertisement or notice of any kind, and "at any such sale said Maynard Kemp may himself purchase the whole or any part of the property sold, free from all right of redemption on the part of the undersigned (maker), which is hereby waived or released." It was at a sale that the pledgee might buy in the property, and it is questioned whether a sale was made here. The mere transfer of the property upon consideration would be a sale by one definition, but it has generally been required that a sale of

pledged property be made in an effort to accomplish the purpose of the pledge, that is, the realization of the value for payment of the indebtedness, and return of any excess to the pledgor. *In re Woods' Estate,* 52 Md. 520. In realizing on the collateral, the pledgee acts as agent of the pledgor as well as for himself, and his proceeding must, in the exercise of the fiduciary's duty, have for its object the obtaining of the value on behalf of both. *Whitman v. Boston Terminal Co.,* 233 Mass. 386, 390, 124 N. E. 43.

The court has recognized the validity of agreements dispensing with the common law restraints upon sale of pledges, or upon the pledgee's buying, with one exception. *Turk v. Grossman,* 176 Md. 644, 666, 6 A. 2nd 639; *Tyng & Co. v. Woodward,* 121 Md. 422, 88 A. 243; *Manning v. Shriver,* 79 Md. 41, 28 A. 899. It is generally held that appropriation under an agreement that upon default the pledge shall forthwith become irredeemable, and the property become the pledgee's own, amounting as it would to a mere forfeiture, would be voidable. *Dibert v. Wernicke,* 214 Fed. 673. And the more closely a transfer to the pledgee approximates a forfeiture, the more closely must a court, if the question is raised, scrutinize the transaction to determine whether a realization of the value of the pledge has been sought in good faith. The sale testified to in this instance is such as some courts have regarded as a forfeiture. *Ohio Nat. Bank v. Central Construction Co.,* 17 App. D. C. 524; *Union Trust Co. v. Harnwell,* 158 Ark. 295, 250 S. W. 321; Note 76 *A. L. R.* 705, 736. *Seasongood, Drastic Pledge Agreements,* 29 Harvard Law Review, 277. Dealing with the possibility of an outside competitive market has sometimes been required, nothwithstanding the breadth of the power to buy in at private sale without notice. *Lowe v. Ozmun,* 3 Cal. App. 387, 86 P. 729. In the case of *Ohio Nat. Bank v. Central Construction Co., supra,* one in which a pledgee bank with a similar power held a form of auction on its own premises, with its president acting as auctioneer, and two or three of its employees present, the court

remarked, "If he [the president] had merely gone to his bookkeeper and told him to enter these securities on his books as the property of the bank, and at the same time to enter a credit of $16,000 on the note, the proceeding would not have been more absurd."

But it is not denied that the power given in the contract to the pledgee to sell to himself at private sale without notice is valid, and the court does not see that what is described as mere appropriation can be distinguished. If it appears that the transaction was made in good faith in an effort to give full value to the property pledged, or if the value obtained by cancellation of debt appears to be all that might reasonably be attributed to the property, there would seem to be no good reason why the transaction should not be upheld. In many cases it is the only way of realizing on collateral. *Colonial Trust Co. v. Central Trust Co.,* 243 Pa. 268, 90 A. 189. The contract and the law are concerned only with seeing that the value has been sought in good faith, or has been realized. The court has not been able to accept the view that any particular form of transfer should be required under this power. *Frey v. Farmers' & Mech. Bank,* 273 Mich, 284, 262 N. W. 911; *Highland v. Davis,* 119 W. Va. 501, 195 S. E. 604; *Seder v. Gould,* 274 Mass. 223, 174 N. E. 311; *Hiscock v. Varick Bank,* 206 U. S. 28 and 38, 27 S. Ct. 681, 51 L. Ed. 945.

"The acts of the [pledgee] must be judged * * * in each case by the facts and circumstances of that case." *Dibert v. D'Arcy,* 248 Mo. 617, 648, 154 S. W. 1116, 1124; *Delaney v. Nanticoke Bank,* 317 Pa. 135, 176 A. 223. After all, this case, so far as the 3599 shares are concerned, is not exactly one of sale of pledged stock. The pledge was of a second lien at best. The stock could not have been delivered on a sale. And it was a second lien on stock in a corporation which was not only in bad financial condition, and losing money, but one for which a receivership and ultimate dissolution were sought. It could be sold only subject to the chances of a forced sale to pay the prior lien. The value would seem to have been

one which existed only for an attempt at reorganization. And reorganization would necessitate control of the Bowman shares in addition. It appears highly probable that the pledgee must be the only buyer, if there should be any buyer at all, and his cancellation of a debt of over $53,-000, in the absence of contradictory facts, seems to have given full value to the pledge, if not more. It is not testified that more might have been offered at a sale under any other circumstances.

The appellant, arguing from past values, and more especially, applying a formula for valuing the good will of a dairy according to the number of gallons of milk sold daily, argues for a value in the pledge four times as high as the debt cancelled. But with so many gallons sold at a loss the formula cannot apply. It cannot put value into a loss. The pledge could not produce any more than it might bring at a sale, and the situation of the corporation did not promise much from any sale, no matter what the gallonage formula might promise. The debt to the bank for which the property was first pledged was then about $40,000, and with the obligation added to the debt on the notes, a purchaser would undertake total obligations of $93,000. In estimating that burden, the pledge of Irving Kemp to the Dairy is disregarded, for it appears that no money or credit passed to him for his note and pledge over and above that of the $60,000 obtained from the bank for Bowman.

The court does not therefore find any inadequacy of price, or any reason for disturbing the appropriation of the pledge. And it is confirmed in this conclusion by the fact that the appellant did not dispute Maynard Kemp's acquisition at all until he was sued for his debt due the corporation two years later. *Jones, Collateral Securities, etc.,* (3rd Ed.) sec. 743.

We are not unmindful of the rule that such a sale could be set aside by a court in any event only upon payment or tender of the amount of the debt, and there is no payment or tender in this case.

658

Assuming that his contract has not been released or abandoned, as the court finds, the appellant seems to ask only that the debt and the pledge be reinstated, without showing any advantage to him from it. The rule excludes that partial relief, *Jones, Collateral Securities,* (3rd Ed.) sec. 748.

As to the obligation of Irving Kemp to the corporation, adjudged to be $78,954.20, it will be sufficient to say that there was careful and ample accounting of this debt during the hearing below, and the amount seems fully proved by it. It would not be proper to prolong the opinion with a detailed review of the question, but it may be recalled that on August 5th, 1937, Irving Kemp in a memoradum made for discussion of reorganization noted that he owed the corporation then about $75,000.

Some exceptions to rulings on admissibility of evidence are pressed, but none of those rulings interfered with or prejudiced full consideration of the contentions made, and extended discussion of them may be dispensed with.

*Decree affirmed with costs.*