LITTERAL ET AL. *v.* HOUSER

[No. 126, September Term, 1959.]

*Decided February 15, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Edward L. Foster,* for appellants.

*Jerrold V. Powers,* with whom were *Sasscer, Clagett & Powers* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

The individual appellant, assignee of all the rights of sell-

ers of corporate stock representing control of two cemetery companies, claimed a default in payment of an installment of the purchase price and retook the stock from the escrow agent, claiming to hold it free of all interest of the purchaser. Because the purchaser, the appellee, continued to claim to be the owner of the stock and attempted to act in respect of the corporations as if he were, the assignee brought a bill to enjoin him from so acting, for an accounting of all corporate funds improperly spent by the purchaser while he controlled and managed the corporations, and for a declaration that assignee was the owner of the corporate stock, free of any claim of purchaser. The decree was in favor of the purchaser. The chancellor rejected the claim of the assignee that title to the stock had remained in his assignors because its passage was conditional upon payment of the purchase price in full, and held, on the contrary, that title to the stock passed to the purchaser who had pledged it as security for the payment of the price and that as a pledgor he had a right to redeem as he had made proper and timely effort to do. Assignee had joined the two corporations as parties plaintiff to his bill; the chancellor dismissed them and assignee claims error, in that, upon stipulation of the parties, an accounting was decreed as to all monies due or claimed to be due by one side to the other, and the corporations were necessary parties to such an audit. Inasmuch as the purchaser specifically agrees that the corporations, if found to be necessary parties, could be joined as defendants on remand, this claim of assignee will not be considered further.

There remain only the questions of whether the transaction was a conditional sale or a pledge and, if a pledge, the right of the purchaser to redeem.

Washington Memorial Park, Inc., was formed in 1940 to buy a cemetery then in receivership. In 1950 George Washington Cemetery, Inc., was formed to promote and operate the cemetery leaving the first corporation to hold title to the land comprising the cemetery. In 1957 Albert F. Houser and the brothers Raymond and Harold Miller purchased all of the issued capital stock of both corporations—one hundred

shares in each case. Houser bought thirty-four shares of each company, and each Miller thirty-three shares.

The new owners operated the cemetery for some eighteen months. Houser says he put six or seven thousand dollars into the operation; the Millers advanced the operating company over sixteen thousand dollars. Houser managed the enterprise and the Millers, who were in another business, became disenchanted and wished to get themselves and their money out. After several weeks of negotiation, with each side represented by a lawyer, a formal written agreement dated September 22, 1958, was executed by the Millers, Houser, and the two corporations, which provided for the sale by the Millers and the purchase by Houser of sixty-six shares of the stock of each corporation at a price of sixty dollars a share for the stock of the operating company—$3,960.00—and fifty dollars a share for the stock of the holding company — $3,300.00—or a total price of $7,260.00. Five thousand dollars was paid at the execution of the agreement and Houser's promissory note for $2,260.00, payable November 9, 1958, was given for the balance. The operating corporation gave the Millers for the monies they had lent it, and interest, four promissory notes, signed also by the holding company, the first in the amount of $2,740.00 being payable November 9, 1958; the second and third for $5,000.00 each being payable November 10, 1959, and November 10, 1960, respectively; and the fourth for $5,619.72 being payable August 10, 1961. Additionally, the two corporations agreed "to assume all outstanding obligations to date of this agreement" and to save harmless the Millers "from any and all creditors, debts and obligations arising from their interest in the aforesaid corporations from date of their original purchase of the shares of stock and interest in these corporations to date of this agreement * * *."

The agreement then provided in paragraph 4:

"The promissory notes evidencing the amount due Harold I. Miller and Raymond A. Miller from A. F. Houser and the amount due from the George Washington Cemetery, Inc., shall be secured by the pledge

of all the stock of the George Washington Cemetery, Inc., and Washington Memorial Park, Inc., which stock shall include the shares to be sold by Harold I. Miller and Raymond A. Miller and the shares owned by A. F. Houser. These shares of stock shall be pledged and held in escrow by a mutually suitable third person, firm or corporation, and to be so held until payment in full to Harold I. Miller and Raymond A. Miller. * * *

"It is further agreed and understood that in the event of default in the payment of any note due, or interest, which default is not made good within 60 days from due date, then such default shall entitle Harold I. Miller and Raymond A. Miller to declare due and payable, the total amount due them as a balance from A. F. Houser and George Washington Cemetery, Inc., and they can, at their option, demand payment in full of the amount due. Upon such default as herein described, the escrow agent shall, upon demand of Harold I. Miller and Raymond A. Miller or their agent, deliver to them the shares of stock held as security for the payment of said obligations."

As directed by the agreement, the Millers endorsed in blank their sixty-six shares of the operating company stock, Houser his thirty-four shares, and the Millers executed an assignment separate from the stock certificate as to their shares of stock in the holding company, since the certificates representing the shares of that corporation were in possession of a prior pledgee to secure a deed of trust given by that corporation. The endorsed certificates and the assignment covering the Miller shares in the holding company were left with the attorney for the Millers, one Koutoulakos, who acted as escrow agent.

As provided in the agreement Houser, as sole stockholder, immediately held stockholders' and directors' meetings, at which new directors and officers were elected, he being named president.

Houser's note of $2,260.00 and the operating company's note of $2,740.00, both due November 9, 1958, were not paid when due. On January 7, 1959, one day before the end of the sixty-day grace period specified in the agreement, the Millers sold the Houser promissory note and the four promissory notes of the operating company to Kelley Litteral, agent for undisclosed principals, and also assigned to him all of their rights in the contract dated September 22, 1958, between them and Houser. By the terms of the sale to Litteral, the Millers agreed that under no circumstances would they disclose the transaction to Houser of the corporations.

On January 8, 1959, Houser, thinking, he says, that the grace period expired January 9, called one of the Millers to make arrangements for a meeting to pay the two notes. He was told to call the Millers' attorney, Koutoulakos. Houser called Koutoulakos and during the course of the conversation, offered to bring the checks in payment to his office that afternoon and, finally, when Houser suggested that he could send the checks to the bank by registered mail, Koutoulakos said that was what he would do.

Late in the afternoon of January 8, Litteral sent a telegram addressed to Houser for personal delivery only — not addressed to the corporations—purporting to exercise the option to accelerate the due date of the three remaining corporate notes. After Litteral had dispatched the telegram, he sent an emissary to Koutoulakos, who turned over the stock certificates and the assignment which had been left with him as escrow agent.

That same afternoon Litteral had directed the bank at which the notes were payable not to receive payment. That night he, and the members of the group he represented, purported, on the basis of his being the sole stockholder of both corporations, to hold stockholders' and directors' meetings, and elect new directors and officers, although the stock had not been transferred. The next morning, January 9, when Houser appeared at the office of the cemetery, he found there Litteral and several of his group, who announced that they had taken over the corporations and the management of the

cemetery. About eleven o'clock the telegram to Houser was delivered to him for the first time, in Litteral's presence.

Houser mailed the checks for the payment of the two notes on the afternoon of January 8, 1959, and the bank rejected them, pursuant to Litteral's instructions, and returned them to Houser. On January 26, 1959, at the taking of a deposition, Houser tendered Litteral the sum of $21,050.19 in cash, covering the full amount, with interest, of his note and the four notes of the corporations. The tender was refused on the grounds that default and forfeiture already had occurred. At the trial of the case below, Houser tendered $5,500.00 in cash, more than sufficient to cover the principal and interest of his note and the note of the corporations due November 8, 1958.

We agree with the chancellor that the Millers intended to, and did, pass title to the stock they sold Houser and that he, as owner, pledged the shares he already owned and those he had just acquired to secure payment of the purchase price and of the debt of the operating company. The persuasive evidence and inferences are to this effect. No distinction was made between the Miller shares and Houser's original holding. The monies due "shall be secured by the pledge of all the stock." It is unlikely the Millers would cause their own stock to be pledged as security for debts owed them by allowing Houser to purport to pledge stock he did not own. By an express requirement which the Millers caused to be put in the agreement, corporate meetings were to be held by Houser as sole stockholder immediately after the execution of the agreement, at which he was to cause the corporations to ratify and affirm the agreement. Both the agreement itself and the corporate notes were signed on behalf of the corporations by officers of the new regime, Houser as president and one Emil E. Richus, secretary. Clearly, the Millers recognized and treated Houser as *the* stockholder of both corporations after the execution of the agreement and, although the stock was not transferred on the books, they and their assignee Litteral are in no position to deny that he had title to the stock. Cf. *Davey v. Masser,* 204 Md. 612.

The mechanics of the transfer of the stock are consistent

with passage of title and delivery and not with retention of title. The certificates of the Miller stock in the operating corporation were endorsed in blank by them and delivered to the escrow agent, as was an assignment separate from the certificates of stock in the land holding company (those certificates could not be delivered since they were in possession of a prior pledgee).

It is clear that title to stock may pass by constructive delivery, *Young v. Cockman,* 182 Md. 246, and that, if the parties so intend, as we find they did here, title passes to the buyer by delivery of stock to an escrow agent for ultimate delivery to the buyer upon payment of the purchase price, or part thereof. *Short v. Hollingsworth* (Mich.), 289 N. W. 158; *Hoffman v. Commissioner of Internal Revenue,* 71 F. 2d 929 (2d Cir.) ; *Ruml v. Commissioner of Internal Revenue,* 83 F. 2d 257, 258 (2d Cir.) ; *Cochran v. Posey* (Super. Ct. Pa.), 25 A. 2d 733; *Botsford v. Heney* (Cal. Ct. App.— 2d Dist.), 107 P. 593; 18 C.J.S. *Corporations,* Sec. 409, p. 974.

Upon the assumption that there was a passing of title and a pledge, appellant Litteral argues that the real agreement of the parties was that upon default Houser had no right to redeem and the stock would become the absolute property of the Millers. He attempted to show by parol testimony, which was consistently objected to, that this was the real contract. The chancellor admitted parol testimony by both sides, appellee having categorically denied from the stand that there was any agreement other than that expressed in the formal writings after the Millers had testified that there was.

At least three answers to appellant's contentions readily come to mind. First, we may assume without deciding that it was error to have admitted the extrinsic evidence as to the "real" agreement, since clearly there was an integration in the final written contract of September 22, 1958, arrived at and executed after weeks of proposal and counter-proposal and prepared with the aid of a lawyer for each side. *Ray v. Eurice,* 201 Md. 115. There would seem to be no ambiguity or other ground for parol evidence. The law is definitive and uniform as to the rights and obligations of pledgor and pledgee in case

of default. The agreement, which says no more than that upon default the pledgees can call for delivery of the shares "held as security for the payment of said obligations," was implemented by the law applicable in such event, leaving no ambiguity.

Second, the appellant is asking a court of equity to declare a forfeiture in his favor, which almost never will it do. *Cover v. Taliaferro,* 142 Md. 586; *Superior Const. Co. v. Elmo,* 204 Md. 1, 14, *et seq.*

Third, even if there had been the agreement appellant says there was, it would have been void. "An agreement between pledgor and pledgee in connection with the creation of a pledge which purports to deprive the pledgor of his privilege to redeem is void." *Restatement, Security,* Sec. 55, paragraph 1. This statement of the law is recognized in *Dungan v. Mutual Benefit Ins. Co.,* 46 Md. 469, 490-491, and *Kemp v. Kemp,* 178 Md. 645, 655.

The Maryland cases make it plain that a pledgee is a fiduciary as to the pledgor and owes him a duty of fairness. They have laid down the rule that in case of default the pledgee must notify the pledgor and give a right to redeem, and if payment is not made, must sell the stock publicly and cannot buy at the sale unless it has been agreed that the sale may be private or that the pledgee may buy it in. *Baltimore Marine Ins. Co. v. Dalrymple,* 25 Md. 269; *Bryson v. Rayner,* 25 Md. 424; *Manning v. Shriver,* 79 Md. 41; *Tyng & Co. v. Woodward,* 121 Md. 422; *County Trust Co. v. Stevenson,* 170 Md. 550. See also *Dungan v. Mutual Benefit Ins. Co.* and *Kemp v. Kemp,* both *supra.* The agreement in the case at hand is silent as to the status of the stock or what disposition is to be made of it by the pledgee upon default. It follows that, if Houser did not redeem, the Millers, and Litteral, who stands in their shoes, must sell the stock publicly, could not buy it in, and certainly could not appropriate it as their own.

The chancellor held that Houser could not claim at the trial (as he also argued here) that there had been no default because the last day of grace was January 9, in view of the fact that in his answer he had conceded in terms that the

last day of grace had been January 8. We agree, but find it immaterial whether or not there was a default. Houser had a right to redeem the stock in the case of default and he made timely efforts to do so, all of which were refused on the ground that forfeiture had occurred already. The record makes it evident that Litteral and his associates had purchased the contract rights of the Millers under the agreement of September 22, 1958, with the aim and full expectation of being able to secure as their property all the stock in the cemetery companies, and that they were not to be deterred in this purpose by offers of payment, which they did not want, of any installments due or, indeed, of the total amount due. We agree with the chancellor that under the circumstances of the case there was no valid acceleration of the due date of the notes of the cemetery corporations, that upon payment of the amount of the two notes due November 9, 1958, with interest, Houser was entitled to have the notes marked paid and to be current in the obligations due under the agreement of September 22, 1958, and that Houser was and is the president of each of the said corporations and the owner of all of the capital stock pledged under the agreement of September 22, 1958.

*Decree affirmed, with costs.*